UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| CONNECTICUT VETERANS LEGAL CENTER and STRONGHOLD FREEDOM FOUNDATION, <br><br> *Plaintiffs*, <br><br> v. <br><br> DEPARTMENT OF DEFENSE, <br><br> *Defendant*. | Civil Action No. 3:23-cv-00408 <br><br> April 3, 2023 |

**COMPLAINT**

1. In the weeks following the September 11 attacks, the Nation grappled with immense fear, grief, and uncertainty, and the military prepared for war. While fires were still burning at Ground Zero, a contingent of the most elite members of the United States Armed Forces landed at Karshi-Khanabad Air Base, a former Soviet installation in Uzbekistan.

2. Two weeks later, two United States Army Special Forces teams launched from Karshi-Khanabad into Afghanistan to conduct the initial ground attacks against al-Qa'ida and the Taliban. These were the first military boots on the ground in what would become Operation Enduring Freedom, the official name for the War in Afghanistan. Those who remained at Karshi-Khanabad were tasked with supporting operations in Afghanistan and transforming the dilapidated garrison into Camp Stronghold Freedom, the United States Military's foothold in the region.

3. Shortly after their arrival, Air Force personnel noticed fixed signs throughout the base warning of radiation and toxic materials. Security personnel guarding Karshi-Khanabad's perimeter passed out and collapsed while standing next to trenches filled with pools of black goo—a stagnate cocktail of hazardous chemicals that had leeched up from the undersoil. These

servicemembers had to be dragged, unconscious, from their posts. Environmental and occupational health tests conducted by the United States Army Center for Health Promotion and Preventative Medicine (CHPPM) revealed the presence of uranium, chemical weapons, asbestos, aviation maintenance solvents, and jet fuel. These and other liquid contaminants were present in quantities so great that they saturated the soil.



*A U.S. servicemember stands at a warning sign at Karshi-Khanabad Air Base.*

4. At least 15,777 members of the United States Armed Forces served at Camp Stronghold Freedom, or "K2," until its closure in 2005, where they provided essential support to combat operations in Afghanistan. Those stationed at K2 became ill at higher-than-usual rates and consistently complained of suspicious environmental pollutants. The Department of Defense, however, has insisted that there was "nothing to see here," and that servicemembers faced little atypical risk.

5.   These service members worked and lived in punishing conditions, performing their jobs honorably while operating under unfathomable physical and mental stress. They were told that nothing was wrong with the Base and they followed the orders they were given.

6.   Two decades later, however, veterans of Camp Stronghold Freedom still do not know what toxins they were exposed to while serving at Karshi-Khanabad.

7.   For many who were sickened, this missing information frustrates their ability to obtain accurate medical diagnoses and adequate treatment plans. Healthy veterans, meanwhile, fear the unknown, and seek to take proactive steps to monitor their health and limit potential risks.

8.   In order to inform the public about the risks members of our Armed Forces face and to help Karshi-Khanabad veterans obtain information crucial to adequate medical treatment, Plaintiffs Connecticut Veterans Legal Center (CVLC) and Stronghold Freedom Foundation (SFF) requested documents concerning toxic exposure at Karshi-Khanabad in the Department of Defense's possession pursuant to the Freedom of Information Act (FOIA). In violation of FOIA, Defendant has failed to provide timely, adequate responses to these requests.

9.   To make the stakes clear: Karshi-Khanabad veterans have expressed that their bodies are falling apart, and the information in the Defendant's possession is crucial to their medical treatment. They cannot afford any further delay.

10.  Plaintiffs bring this action under the Freedom of Information Act, 5 U.S.C. § 552, to compel Defendant DoD to conduct a reasonable search and promptly produce wrongfully withheld records.

**JURISDICTION AND VENUE**

11.  This Court has jurisdiction over this matter pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. §§ 1331 and 1361.

12.     Venue is proper under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(e)(1)(C) because Plaintiff Connecticut Veterans Legal Center resides and maintains its principal place of business in the District of Connecticut, and no real property is involved in this action.

## PARTIES

13.     Plaintiff Connecticut Veterans Legal Center is a Connecticut-based § 501(c)(3) nonprofit organization that advocates on behalf of veterans, including by providing legal assistance to veterans who have been denied critical health and disability benefits by the Department of Veterans Affairs (VA). Toxic exposure is an understudied issue that affects much of the population CVLC serves. CVLC has represented veterans affected by toxic exposure and often utilizes FOIA to request information that may assist its support of Connecticut's veterans.

14.     Plaintiff Stronghold Freedom Foundation (SFF) is a § 501(c)(3) nonprofit organization that serves to address the toxic exposures of veterans who were deployed to Karshi-Khanabad during Operation Enduring Freedom. SFF grew from a grassroots movement of Karshi-Khanabad veterans who, after finding each other via social media, joined together as they navigated serious health issues they believed were caused by toxic exposure there.

15.     Defendant Department of Defense (DoD) is the federal agency responsible for coordinating and supervising all agencies and functions of the United States government directly related to the United States Armed Forces. DoD is an agency within the meaning of 5 U.S.C. § 552(f).

**FACTUAL ALLEGATIONS**

16. Until 1992, Karshi-Khanabad was an airbase for the Armed Forces of the Union of Soviet Socialist Republics.

17. For years, the Soviet Armed Forces disposed of aviation maintenance solvents and chemicals at Karshi-Khanabad, contaminating the soil and surrounding environment.

18. United States Armed Forces uncovered two hazardous material disposal areas from the Soviet period at Karshi-Khanabad. The first was a large field with a bottomless two-hundred-liter drum that channeled hazardous aviation maintenance solvents and material directly into the ground. The second was a drainage ditch that collected chemical runoff from the aviation maintenance sites and, similarly, channeled the hazardous substances directly into the surrounding earth.

19. The Soviet Armed Forces piped jet fuel into Karshi-Khanabad from four miles away from the base. Approximately ten percent of all fuel transported along this pipeline leached directly into the ground at the Air Base.

20. Altogether, millions of gallons of jet fuel and aviation maintenance solvents seeped into the ground at Karshi-Khanabad. These compounds are not water soluble and remained in the earth.

21. While operating at Karshi-Khanabad, the Soviet Union maintained stores of nerve agents, likely for use in the Soviet-Afghan War. When the Soviet Armed Forces left Karshi-Khanabad in 1992, they detonated the facilities where nerve agents were prepared and stored, scattering nerve agents throughout the base and leaving trace amounts in the ground and structures.

22. Uzbekistan was also one of the largest suppliers of uranium for the Soviet Union, and uranium was mined in the region surrounding Karshi-Khanabad. The yellowcake uranium was

then transported to Karshi-Khanabad and concentrated to facilitate its transport elsewhere. This process reduced the amount of raw material by partially enriching the uranium. When the Soviet Union left Karshi-Khanabad, they also detonated the facility where the uranium was processed, which scattered partially enriched, radioactive uranium throughout Karshi-Khanabad.

23. Uzbekistan took control of the base in 1992, after the dissolution of the Soviet Union and its emergence as an independent nation.

### *United States Armed Forces at Karshi-Khanabad*

24. On October 5, 2001, elements of the elite Combined Joint Special Operations Task Force, including 5th Special Forces Group, 160th Special Operations Aviation Regiment, Air Force Combatant Controllers, and other supporting units, landed at Karshi-Khanabad to begin the invasion of Afghanistan. These servicemembers were not informed of the presence of toxic substances at Karshi-Khanabad.

25. When the United States Armed Forces arrived, the only remaining infrastructure was several hardened aircraft shelters. It took six weeks for tents to arrive at Karshi-Khanabad. In the interim, servicemembers utilized the hardened aircraft shelters for working and living spaces. Many Karshi-Khanabad veterans slept in sleeping bags directly on the ground.

26. When tents arrived, servicemembers transitioned to working and sleeping in their tents. The tents would often fill with the foul-smelling water that flowed throughout Karshi-Khanabad, combining with other substances scattered on the ground and in the soil.



*"Tent City" at Camp Stronghold Freedom collected rainwater from around the Air Base.*

27. Upon their arrival, members of the United States Armed Forces began constructing earthen berms to improve the Air Base's security against the sporadic incoming small-arms fire that the Base faced from Islamic extremists inside Uzbekistan.

28. To construct the berms, servicemembers dug trenches approximately one hundred yards long by five feet wide to supply the necessary dirt. The berms and trenches completely encircled K2.

29. Soon after servicemembers at Karshi-Khanabad began manning security positions atop the berms, they started reporting severe and otherwise unexplained medical symptoms, including headaches, nausea, and loss of consciousness. Those not positioned on the berms similarly developed strange symptoms, including headaches, nausea, and full-body rashes.

30. Colonel Gordon Peters, M.D., M.P.H. (ret.) was the Joint Special Operations Task Force Surgeon who led the medical team that cared for the Special Operations Forces (SOF) at Karshi-Khanabad during the initial invasion of Afghanistan. Dr. Peters was alarmed by the high

7

rates of servicemembers presenting to the sick bay with symptoms. He launched an investigation into the working conditions on the berms. Dr. Peters discovered a chemical odor emanating from the trenches that was so intense that he believed lighting one match would ignite the entire area.

31. Dr. Peters observed that the trenches were filled with a liquid that was approximately one and one-half feet deep. The liquid was thick and dark at the bottom and viscous and chemical-solvent-like at the top. Dr. Peters assessed that there was significant chemical contamination in the liquid and that the chemical contamination had likely caused the severe symptoms that the Karshi-Khanabad servicemembers stationed on the berms reported to him.

32. CHPPM arrived at Karshi-Khanabad approximately ten days later to conduct an environmental and occupational health study. Such studies must be completed if servicemembers will be present at a location for more than thirty days, but the alarming reports from Karshi-Khanabad prompted expedited assessments. This CHPPM team consisted of five scientists, including industrial hygienists and epidemiologists.

33. Soon after arriving, CHPPM discovered asbestos throughout the Air Base.

34. CHPPM conducted tests of the liquid in the trenches and identified several volatile organic compounds, predominately jet fuel and aviation maintenance solvents.

35. These contaminants were remnants of the era of Soviet Union control. Excavating the ground to construct the berms had exposed soil saturated with large amounts of the chemicals that the Soviets had poured into the earth. The contaminants then stagnated in the trenches.

36. During this initial survey, CHPPM tests detected the presence of an organophosphate nerve agent.

37. CHPPM also discovered yellowcake uranium scattered throughout an approximately twenty-acre field between the western wall of Karshi-Khanabad and the main road

into town. This survey determined that the uranium was not depleted. Instead, CHPPM personnel told Camp Stronghold Freedom leadership and medical staff that the uranium scattered in the field was *radioactive* yellowcake uranium, detailing the tests they had run to distinguish between depleted and partially enriched uranium.

38. The United States Military contracted with locals to truck gravel into the Air Base and cover the contaminated ground in order to address the hazard posed by toxic organic volatile compounds that saturated the soil. This process took several months, and many servicemembers at Karshi-Khanabad had to sleep directly on the contaminated ground in the intervening period.

39. The gravel provided minimal protection. The volatile organic compounds in the soil off-gassed at a high rate, and an abrasive chemical smell was present long after the gravel project was completed.

40. Security personnel continued to maintain defensive positions on top of the berms directly above pools of toxic contaminants.

41. Areas that were identified as contaminated with asbestos and uranium were cordoned off.



*Radiation warning sign at Karshi-Khanabad with a pond in the contaminated area.*

9

42. Servicemembers at Karshi-Khanabad were advised to avoid unnecessary digging into the earth. However, extensive digging was necessary to develop and maintain this major air base, exposing servicemembers directly to toxic substances.

43. The earthen security berms channeled Karshi-Khanabad's substantial rainwater directly into living and working areas. This water indiscriminately flowed through the cordoned-off areas and living areas alike.

44. Karshi-Khanabad servicemembers were not briefed about the risks from the toxic substances that CHPPM discovered. After CHPPM's study, servicemembers continued to live at and operate from Karshi-Khanabad in support of the ongoing War in Afghanistan.

45. Increasingly, conventional troops and units from the Marine Corps, Army, Air Force, and Navy cycled through Karshi-Khanabad alongside SOF. These veterans likewise stood guard atop berms a few feet above stagnant pools of black goo; worked alongside signs warning of areas contaminated with radioactive materials and chemical agents; and slept in tents filled with pools of rainwater that brought it all into their living spaces.

46. During the ensuing years, toxic exposure at Karshi-Khanabad persisted.

47. In June 2002, two unidentified individuals in hazardous contamination suits evacuated servicemembers from a hardened aircraft shelter at Karshi-Khanabad. These servicemembers were told later that the evacuation was predicated on a false-positive detection of an unspecified hazard, and they were cleared to return to the hardened aircraft shelter.

48. Also in June 2002, a soldier wearing a gas mask took air samples utilizing a Chemical Agent Monitor in a storage room at Karshi-Khanabad.

49. This masked soldier notified a Karshi-Khanabad servicemember in the room that he had detected the presence of Mustard Gas in two locations, and a different chemical agent, either a blood, blister, or nerve agent, in a third location.

50. In the days that followed, the Karshi-Khanabad servicemembers in this storage room were told that the alarms were false positives caused by pesticides. Later, they were told that paint fumes caused false positives.

51. The storeroom's servicemembers were nonetheless given new work quarters, but the flight and survival equipment from the room was placed back into issue circulation without decontamination. The aircrew who utilized this equipment were not briefed about these events.

52. In 2005, relations between the United States and Uzbekistan deteriorated. The United States Armed Forces ceased utilizing Karshi-Khanabad in November 2005.

53. The number of military personnel who deployed to Karshi-Khanabad exceeds 15,777.

### *Advocacy Efforts and Increasing Knowledge of Toxic Exposure at Karshi-Khanabad*

54. In the following years, many of those who served at Karshi-Khanabad developed serious and often rare medical conditions, including cancers and other lethal illnesses. Many of them, together with their families, struggled to access appropriate treatment within the military, at the Department of Veterans Affairs, and from civilian providers. And many of those who had served on the base died.

55. Beginning in 2012, Karshi-Khanabad veterans banded together on social media in an informal group to discuss the medical conditions they and their friends had developed. They remembered the roped-off areas of contamination and the Soviet-era "Danger: Radioactive" signs that dotted the base. They believed that these illnesses, unusual for their demographic groups,

stemmed from toxic exposures at K2. Karshi-Khanabad Veterans Paul Widener and Mike West formed a Facebook group, "Karshi-Khanabad, Uzbekistan Radiation and Toxic Exposure."

56. Mr. West was diagnosed with colon cancer and other health issues in 2010. Together, Mr. West and Mr. Widener hoped that the Facebook group could lend moral support to K2 veterans and uncover more knowledge about the toxic exposure there. Mr. West died of cancer in 2013.

57. Without access to necessary information from Defendant, Karshi-Khanabad veterans used the Facebook group to pool their resources and share what evidence they could find from open sources and their own recollections. The group grew as more and more Karshi-Khanabad veterans fell ill with rare conditions and connected with their fellow K2 veterans, seeking any information that could help determine why they were sick. The Facebook group remains a critical resource for these veterans.

58. In December 2019, McClatchy DC published an article, "Cancers strike veterans who deployed to Uzbek base where black goo oozed, ponds glowed."

59. This article assessed the extent of the toxic exposure at Karshi-Khanabad. The information in this article was obtained through interviews with Karshi-Khanabad veterans, including members of the Facebook group, and notably, documents and portions of documents obtained by McClatchy that remain in Defendant's possession.

60. This article reported many facts for the first time. DoD still has not made many of the documents uncovered in McClatchy's reporting publicly available.

61. Though the article was pathbreaking, the documents uncovered through McClatchy's reporting do not contain information sufficient to determine conclusively what toxins Karshi-Khanabad veterans were exposed to.

62. The article nevertheless provided an impetus for rapid growth in the group's membership, and Stronghold Freedom Foundation (SFF) was incorporated as a § 501(c)(3) nonprofit organization in March 2020 as a result.

63. SFF began working with Congress to obtain information from Defendant about toxic exposure at Karshi-Khanabad.

64. On July 9, 2020, the House Committee on Oversight and Reform Subcommittee on National Security released a small number of previously classified reports from 2001, 2002, and 2004 that were produced by Defendant. The DoD withheld these documents from Congress for months before turning them over.

65. CHPPM's report and findings from their initial survey of environmental and occupational health conditions at Karshi-Khanabad still have not been released.

66. The contaminants described in the declassified reports are of an insufficient type or quantity to explain the severe symptoms that many Karshi-Khanabad veterans experience.

67. Many conclusions in the released reports are not consistent with earlier reports and accounts from Karshi-Khanabad veterans, and these disparities are inadequately explained by the reports that Defendant has released thus far.

68. Many Karshi-Khanabad veterans are still fighting to manage and treat their rare illnesses. The occurrence of these illnesses in otherwise healthy individuals often astounds their doctors. Veterans who served at Karshi-Khanabad know that they were exposed to potential toxins but are unable to explain what they were exposed to, and their doctors are unable to determine whether their exposure was sufficient to warrant further testing.

69. Mr. Brian Fausett, who deployed to Karshi-Khanabad from 2002 to 2003, was hospitalized for three days while serving at Karshi-Khanabad. Though healthy before deploying,

Mr. Fausett has since had ongoing health issues, including photosensitive migraines and small fiber neuropathy.

70. Mr. Fausett lived with the often-debilitating symptoms of these illnesses for years, while doctors struggled to accurately diagnose and treat his conditions. It was only after Mr. Faucett could prove that he was exposed to toxic substances via the 2019 McClatchy article that his doctor approved a nerve biopsy, which led to his current nerve fiber neuropathy diagnosis.

71. Similarly, Ms. Meredith Politte, who served at Karshi-Khanabad from September to December 2003, fell ill while at Karshi-Khanabad. During a biomedical briefing upon her arrival at Karshi-Khanabad, Ms. Politte asked if the servicemembers were safe with the known toxins present. The briefer retorted that, "he was glad he already had kids," implying that the servicemembers could face serious health repercussions.

72. Ms. Politte developed Raynaud's Disease and gastrointestinal issues while at Karshi-Khanabad. She has since developed an autoimmune disorder and neurological issues, and suffered a stroke at age 34. Now a nurse, Ms. Politte believes that knowledge of what substances she was exposed to would have provided essential context as she navigated these ailments.

73. Mr. Fausett and Ms. Politte's stories demonstrate a common issue among veterans of Karshi-Khanabad: without accurate and complete patient histories, including toxic exposures, patients and medical providers alike struggle to piece together a complete picture of an individual's health issues.

### *Plaintiffs' FOIA Requests*

74. After reviewing the documents released by Congress in 2020 and the documents published by McClatchy, Plaintiffs determined that these records were insufficient to explain the rare illnesses experienced by Karshi-Khanabad veterans, the large number of first-person reports

of toxic exposure at Karshi-Khanabad, and evidence of toxic exposure at Karshi-Khanabad from unofficial sources, which stand in tension with the benign nature of DoD's reports.

75. Plaintiffs surmised that, because of the substantial difference between earlier-in-time and later-in-time reports released by DoD, there are likely documents in DoD's possession that contain relevant information.

76. This is further supported by the documents obtained by McClatchy that were in DoD's possession and that have not otherwise been publicly released.

77. Information contained in such documents could provide invaluable support to Karshi-Khanabad veterans and their healthcare providers. Records from DoD could contain information that would allow healthcare providers to know with greater certainty the type and quantity of toxic substances that Karshi-Khanabad veterans were exposed to.

78. To better inform the public of the risks these veterans faced and to facilitate veterans' efforts to provide their doctors with the information doctors need to perform their jobs, Plaintiffs submitted a series of FOIA requests to DoD.

79. The DoD has not provided a comprehensive list of those units that served at Karshi-Khanabad, nor has it contacted personnel that served at the Airbase and informed them of the exposures they faced. Stronghold Freedom Foundation has developed an unofficial list identifying scores of units that served at Karshi-Khanabad. *See* Exhibit A. Identification of those exposed is a critical first step in helping veterans secure screening and treatment.

80. On August 24, 2022, Plaintiffs submitted FOIA requests via mail to the DoD Office of the Inspector General (OIG) and the United States Army Public Health Center (APHC), an organization under DoD's authority and successor agency of CHPPM.

81. On October 11, 2022, Plaintiffs submitted the same FOIA requests to the Office of the Secretary of Defense (OSD), United States Central Command (CENTCOM), and United States Special Operations Command (SOCOM) via mail. These three entities are under DoD's authority.

82. OIG acknowledged receipt of the FOIA requests on August 31, 2022. OIG characterized the FOIA requests as misdirected. OIG directed plaintiffs to send their requests to OSD but took no action to route the FOIA requests to OSD or any other responsive agency within DoD's organizational structure. OIG stated on a phone call that they would take no further action with regard to this request on August 31, 2022, and never provided a formal written response with notice of administrative appellate routes, nor did they re-direct the request elsewhere within DoD.

83. The FOIA requests submitted to APHC were delivered on August 30, 2022, though APHC did not acknowledge receipt of the FOIA requests until October 11, 2022. On October 13, 2022, APHC instructed Plaintiffs to amend their FOIA requests and to resubmit them in electronic format. Plaintiffs resubmitted the amended FOIA requests to APHC via email on January 30, 2023 (copy attached as Exhibit B). APHC has not responded to this resubmission in any form.

84. OSD acknowledged receipt of the FOIA requests via email on October 27, 2022, and notified Plaintiffs that OSD placed their FOIA requests in the complex processing queue.

85. SOCOM acknowledged receipt of the FOIA requests on October 27, 2022, and denied that they were in possession of any responsive documents. SOCOM notified Plaintiffs via phone that CENTCOM would have responsive documents but never provided a formal written response with notice of administrative appellate routes, nor did they re-direct the request elsewhere within DoD.

86. The FOIA requests were mailed to CENTCOM on October 11, 2022. For 123 days these requests sat in CENTCOM's mailbox. On February 24, 2023, the United States Postal Service returned these requests to CVLC and SFF as "unclaimed."

87. During a February 24, 2023, call between Plaintiffs' counsel and CENTCOM, CENTCOM confirmed that the address that the FOIA requests were delivered to was the correct mailing address for submitting FOIA requests to CENTCOM.

88. On January 26, 2023, Plaintiffs submitted a supplemental FOIA request to OSD and CENTCOM (copy attached as Exhibit C). The purpose of this supplemental request is to request that Defendant produce copies of the documents in their possession that were published by McClatchy.

89. OSD acknowledged receipt of this supplemental request on February 6, 2023, and placed this request in the complex processing queue on February 16, 2023. OSD did not provide a date on which a determination is expected to be dispatched.

90. In a letter dated March 6, 2023, but received by Plaintiffs on March 28, 2023, and attached as Exhibit D, OSD provided a "final response" to Plaintiffs' FOIA. OSD wrote that it lacked responsive documents and referred Plaintiffs to additional "DoD Components" to which Plaintiffs could submit new FOIAs, if they desired. Plaintiffs filed an administrative appeal on March 31, 2023.

91. OSD's response elaborates DoD FOIA response policy and practice, stating: "There is no central FOIA processing point for records for the entire Department of Defense (DoD). FOIA processing is decentralized and delegated to those officials of the Military Departments and various DoD Components who generate and/or maintain the records being sought or reviewed."

92. OSD's response is functionally the same as OIG's response in August of 2022, except that OIG and OSD referred Plaintiffs to different "Components" of DoD. *Supra* ¶. 82.

93. In short: Plaintiffs submitted a FOIA request to OIG. OIG responded by characterizing the Request as misdirected, denying that they held any responsive documents. OIG directed plaintiffs to resubmit to OSD, who OIG claimed held responsive documents. Plaintiffs resubmitted their request to OSD as OIG directed. OSD then responded by again characterizing the Request as misdirected, and again denying that they held any responsive documents. OSD then directed Plaintiffs to submit their FOIA Request to two new DoD components.

94. DoD's practice of closing FOIA requests without producing responsive documents and requiring FOIA requestors to submit new FOIA requests demands extensive time and resources on the part of requestors and allows DoD to restart the FOIA statutory deadline in clear violation of FOIA's requirements.

95. CENTCOM received the supplemental FOIA request on January 30, 2023, and has not responded to this supplemental request in any form.

96. Camp Stronghold Freedom veterans need the information in the withheld documents to receive timely preventative care, accurate medical diagnoses and effective treatment plans. It is crucial that Plaintiffs receive the requested information promptly, as required by statute, so that they may begin disseminating this information to veterans of Camp Stronghold Freedom.

97. In the two hundred and twenty-two days since CVLC and SFF submitted their first FOIA requests, DoD has not produced a single document. Karshi-Khanabad veterans have been denied the information in DoD's possession for two decades. Today, many Karshi-Khanabad veterans remain seriously ill. They must have the requested information before it is too late.

## CAUSES OF ACTION

98. Plaintiffs repeat and incorporate every allegation contained in paragraphs 1-97 as if set forth in full.

99. Defendant's failure to notify Plaintiffs within twenty days (excepting Saturdays, Sundays, and legal public holidays) whether it will comply with their requests violated their rights to records under 5 U.S.C. § 552(a)(6)(A) and 5 U.S.C. § 552(a)(3)(A).

100. Defendant's failure to release responsive, non-exempt records violated Plaintiffs' right to those records under 5 U.S.C. § 552(a)(3)(A).

101. Defendant's failure to make a reasonable search for responsive records violated Plaintiffs' rights under 5 U.S.C. § 552(a)(3)(C).

102. Defendant's practice of refusing to route misdirected requests to the appropriate agency component violated Plaintiffs' rights under 5 U.S.C. § 552 (a)(6)(A)(ii).

## REQUESTED RELIEF

WHEREFORE, Plaintiffs SFF and CVLC respectfully request that this Court:

(1) Order Defendant to conduct a reasonable search for records responsive to Plaintiffs' requests;

(2) Order Defendant to disclose and release responsive, non-exempt records in their entireties;

(3) Order Defendant to grant a full fee waiver to Plaintiffs;

(4) Provide for expeditious proceedings in this action;

(5) Award Plaintiffs costs and reasonable attorney fees in this action as provided by

   5 U.S.C. § 552(a)(4)(E); and

(6) Issue a declaratory judgment stating that, with respect to FOIA requests that DoD components determine to be misdirected, Defendant's practice of responding to these

requests by refusing to redirect these requests within DoD to the correct DoD Component and instead requiring that these requests be resubmitted constitutes a violation of FOIA's routing and effective search provisions.

(7) Grant any other relief the Court deems appropriate.

Dated: April 3, 2023
New Haven, CT

Respectfully Submitted,

By: /s/ Michael J. Wishnie
Grace Fenwick, Law Student Intern[*]
Derek Nelson, Law Student Intern[*]
Michael Sullivan, Law Student Intern[*]
Nate Urban, Law Student Intern[*]
Meghan Brooks, ct31147
Michael J. Wishnie, ct27221
Veterans Legal Services Clinic
Jerome N. Frank Legal Services Organization
P.O. Box 209090
New Haven, CT 06520-9090
Tel: (203) 432-4800
meghan.brooks@ylsclinics.org
michael.wishnie@ylsclinics.org

---

[*] Motion for law student appearances forthcoming.