## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CONNECTICUT VETERANS LEGAL CENTER, ET AL., | : | |
| | : | |
| *Plaintiffs*, | : | Case No. 3:23-CV-408 (KAD) |
| | : | |
| v. | : | |
| | : | |
| DEPARTMENT OF DEFENSE, | : | April 26, 2024 |
| *Defendant*. | : | |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I.   INTRODUCTION

This is a Freedom of Information Act ("FOIA") case brought under 5 U.S.C. § 552 by Plaintiffs Connecticut Veterans Legal Center ("CVLC") and Stronghold Freedom Foundation ("SFF") (collectively, "Plaintiffs"). The case centers on Plaintiffs' FOIA requests to the Defendant Department of Defense ("DoD") generally seeking occupational and environmental health information extending back decades related to Karshi-Khanabad Air Base ("K2"), Uzbekistan, otherwise known as Camp Stronghold Freedom. Though this case has one named defendant, it involves numerous DoD subcomponents specified in the complaint, including: United States Central Command ("CENTCOM") located out of MacDill Air Force Base ("AFB"), FL; Defense Centers for Public Health – Aberdeen ("DCPH-A") (formerly Army Public Health Center) located out of Aberdeen Proving Ground, MD; DoD Office of Inspector General ("DoD IG") located out of Alexandria, VA;  United States Special Operations Command ("SOCOM") located out of MacDill AFB, FL; and the Office of the Secretary of Defense ("OSD") located out of the Pentagon in Arlington, VA.

Following searches, processing, and productions by the abovementioned subcomponents, completed on December 29, 2023, the DoD produced more than 150 documents consisting of more than 4,000 pages.[1] For records located by CENTCOM, DoD applied redactions to the names of lower ranking personnel on two pages of its production pursuant to FOIA Exemptions 3 (required by statute) and 6 (personal privacy interest); the signature of a general officer pursuant to Exemption 6; and withheld 23 pages pursuant to Exemptions 5 (deliberative process) and 6. For records located by DCPH-A, DoD applied redactions to 5 documents pursuant to Exemptions 1 (classified information), and redactions to 35 documents pursuant to Exemption 3 and/or Exemption 6 for the names, signatures, and contact information of lower ranking personnel. DoD IG did not locate any responsive documents. DoD OSD only located records duplicative of those provided to Plaintiff by DCPH-A. SOCOM only located records that originated with other DoD subcomponents.

SOCOM and CENTCOM referred records[2] to one or more of the abovementioned subcomponents, as well as to other subcomponents not named in the complaint and who did not receive FOIA requests from Plaintiffs, including the National Geospatial-Intelligence Agency ("NGA") based out of Springfield, VA, and the United States Army Special Operations Command ("USASOC") based out of Fort Liberty, NC. The non-party subcomponent referrals ultimately resulted in the production of an eleven-page document, to which NGA applied redactions pursuant to Exemptions 1, 3, and 6 as well as a one-page document, to which

---

[1] The pages of information were produced in various electronic formats including Microsoft Word, Access Database, Excel Worksheet, Adobe PDF, JPEG image, etc. Total page numbers may vary depending on printing formatting.

[2] SOCOM referred one document to USASOC, one document to CENTCOM, and two documents to DCPH-A. CENTCOM referred one document to NGA and two documents to DCPH-A.

USASOC applied redactions to two names of relatively lower ranking personnel pursuant to FOIA Exemptions 3 and 6.

At the conclusion of this process, with the exception of not challenging DoD IG's search, Plaintiffs essentially challenge the adequacy of every other subcomponent search[3] and every single withholding and/or redaction. *See* ECF No. 36, p. 2.

Having completed its search for responsive records subject to FOIA and having released all nonexempt information, DoD respectfully moves the Court to grant summary judgment, pursuant Local Civil Rule 7(a) and Rule 56(a), since DoD performed adequate searches and appropriately withheld information pursuant to FOIA Exemptions 1, 3, 5, and 6.

## II.   FACTS

### A. Administrative Background

The FOIA requests in this case were sent from the Jerome N. Frank Legal Services Organization at Yale Law School in New Haven, CT, on the behalf of two distinct organizations, SFF and CVLC. LRS[4] ¶ 4. Plaintiff SFF is a nonprofit based in the District of Arizona founded to address the alleged toxic exposures of military veterans who were deployed to Karshi-Khanabad, Uzbekistan during Operation Enduring Freedom. LRS ¶ 2. Plaintiff CVLC is a nonprofit based in the District of Connecticut whose mission generally concerns helping veterans who are recovering from homelessness and mental illness to overcome legal barriers in housing, healthcare, and income. LRS ¶ 1.

---

[3]Plaintiffs challenge the search with respect to fourteen subparts of three of its requests originally containing twenty-eight subparts. *See* ECF No. 36, p. 2, ¶ 5.

[4]Citations for the factual statements in this memorandum are made to the Defendant's Local Rule 56(a)1 Statement ("LRS").

For purposes of this action, the DoD consists collectively of subcomponents CENTCOM, SOCOM, DCPH-A, OSD, and DoD IG. LRS ¶ 3.

In or around August of 2022, Plaintiffs sent DoD IG a FOIA request, which was also addressed to APHC. LRS ¶ 5. DoD IG queried the DoD OIG web page that lists the report names of DoD OIG audits, administrative investigations, and evaluations, using the key words "Karshi-Khanabad" and "Uzbekistan" and no responsive results were located. LRS ¶ 6. DoD IG determined the records that Plaintiffs sought originated within another DoD Component; most likely the United States Army Public Health Center ("APHC"). LRS ¶ 7. DoD IG informed the requester that based on the wording of the request, APHC would be the agency most likely to hold the records sought and best suited to take action on the request. *Id*. DoD IG also suggested to Plaintiffs that they contact the OSD FOIA Office for more information, as Plaintiffs' request suggested Congressional interest in the topic. LRS ¶ 9. Since Plaintiffs addressed the same request to the APHC, DoD IG did not send the request to that agency as a misdirected request and informed Plaintiffs DoD IG would not take any further actions. *Id*. Though the complaint discussed DoD IG as a relevant subcomponent within this action, Plaintiffs have subsequently specified that there are no remaining items in dispute regarding Plaintiffs' requests submitted to DoD IG. *See* ECF No. 36, at p. 2, ¶ 6.

In or around October 2022 and January 2023, Plaintiffs filed FOIA requests with the OSD/Joint Staff ("JS") requester service center. LRS ¶ 11. OSD corresponded with Plaintiffs following each request. *See* ECF No 1, at ¶¶ 84 and 90.

In or around August 2022 and January 2023, Plaintiffs sent FOIA requests to APHC. LRS ¶ 12. APHC has migrated to the Defense Health Agency ("DHA") and is now called

4

DCPH-A. LRS ¶ 28. Since DCPH-A was formerly known as APHC, it is often referred to as such. LRS ¶ 29.

Generally, Plaintiffs asked DCPH-A for any and all United States Army Center for Health Promotion and Preventative Medicine (USACHPPM) records relating to K2 from September 12, 2001 to present, possessed by DCPH-A;  any and all records in DCPH-A's possession related to occupational and environmental health at K2; and all records, reports, laboratory notes, testing data, draft reports, and correspondence related to the alleged previously released documents and certain cited documents available in the public domain.  LRS ¶ 13. Prior to the commencement of litigation in this case, DCPH-A had previously searched for K2 records in response to an earlier request by a different requester.[5]  LRS ¶ 36.

In or around October 2022, Plaintiffs filed FOIA requests with CENTCOM's Request Service Center via the mail. LRS ¶ 14. The FOIA request was returned to the requester, as unclaimed, before it reached the U.S. Central Command FOIA Office. LRS ¶ 15. A supplemental FOIA request was sent again by United States Postal Service mail in January of 2023. LRS ¶ 16. In the January 2023 requests to DCPH-A and CENTCOM, Plaintiffs referenced a "McClatchy" article and included a weblink in the CENTCOM request that is behind a paywall. LRS ¶ 17.

In or around October, 2022, Plaintiffs submitted three FOIA requests to USSOCOM generally seeking public health documents or information pertaining to K2.  LRS ¶ 18.

---

[5]That case was *National Public Radio et al., v. U.S. Central Command, et al.*, 22-CV-670 (CRC) (D.D.C.). There, the plaintiffs filed an action generally seeking the release of information alleged to be in the possession and control of CENTCOM, the U.S. Air Force, and the U.S. Army pertaining to the Karshi-Khanabad (K2) Air Base in Uzbekistan.  *National Public Radio*, 22-CV-670 (CRC) at ECF No. 1.  Most of the searches in that case appear to have produced no records, and the bulk of the limited number of responsive documents located in that case, appear to be among the numerous documents located in this case, as outlined below. *Id.* at ECF No. 22-2.  That case ended in a stipulated dismissal. *Id*. at ECF No. 31.

USSOCOM would not maintain the type of information requested, which it communicated to Plaintiffs in or around October 2022. LRS ¶ 19.

### B. The Present Action

Plaintiffs filed this action on April 3, 2023. ECF No. 1. Once the requests were the subject of litigation, Agency Counsel at DoD OSD assumed responsibility for both processing the requests to OSD and coordinating the overall response to the universe of records from the multiple DoD components. LRS ¶ 97. On May 19, 2023, Defendant filed an Answer with affirmative defenses. See ECF No. 21. The parties met and conferred telephonically on June 9, 2023 and subsequently over email, and proposed a scheduling order on June 22, 2023, which the Court approved and adopted on June 26, 2023. *See* ECF Nos. 24 and 25.  The scheduling order set the first production as July 31, 2023, the second production as August 31, 2023 and the final production as September 30, 2023. *See* ECF No. 25. The final production was ultimately extended to December 29, 2023.  *See* ECF Nos. 31, 33, and 35.

On January 29, 2024, the parties filed a joint status report which indicated Plaintiffs contested DoD's withholdings and its search with respect to some items from three multi-tiered requests. *See* ECF No. 36. Plaintiffs averred they did not have any items remaining in dispute with DoD OIG. *See Id*. at p. 2, ¶ 6.

### III.   <u>STANDARD OF REVIEW</u>

### A.  Summary Judgment under Federal Rule of Procedure 56(c)

The standard governing the appropriateness of summary judgment is well defined. Federal Rule of Civil Procedure 56(c) provides that a court shall render summary judgment when a review of the entire record demonstrates "that there is no genuine issue of material fact."

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). In determining whether there is a genuine issue of material fact, the court must resolve ambiguities and draw factual inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

"When a motion for summary judgment is supported by documentary evidence and sworn affidavits, the nonmoving party must do more than vaguely assert the existence of an unspecified disputed material fact or offer speculation or conjecture." *Kroposki v. Fed. Aviation Admin.*, No. 08-CV-01519 (AWT), 2010 WL 11565869, at *1 (D. Conn. June 1, 2010) (citing *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990).

### B. FOIA

FOIA requires all United States government agencies to disclose agency records upon any request for records which "(i) reasonably describe such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed." 5 U.S.C. § 552(3)(A).

"The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). "In general, FOIA embodies 'a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language.'" *Reprod. Rts. & Just. Project v. Dep't of HHS*, 490 F. Supp. 3d 516, 524 (D. Conn. 2020) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 360–61 (1976)).

### C. Summary Judgment in the FOIA Context

Courts review an agency's response to a FOIA request *de novo*. *Hopkins v. Dep't of Housing and Urban Development*, 929 F.2d 81, 83 (2d Cir. 1991); *Reprod. Rts. & Just. Project*, 490 F. Supp. 3d at 524. First, agencies must conduct a search "reasonably calculated to uncover all relevant documents." *Weisberg v. Dep't of Just.*, 705 F.2d 1344, 1351 (D.C. Cir. 1983); *see also, Stroud v. Fed. Bureau of Prisons*, Case No. 22-CV-00799 (KAD), 2023 WL 4405657, at *7 (D. Conn. July 7, 2023) (*citing N.Y. Times Co. v. U.S. Dep't of Just.*, 390 F. Supp. 3d 499, 511 (S.D.N.Y. 2019)).

> The standard for determining whether a search is adequate is well settled. 'A search is considered adequate if it was reasonably calculated to uncover all relevant documents. Reasonableness does not demand perfection, and a reasonable search need not uncover every document in existence. The agency is not expected to take extraordinary measures to find the requested documents.'

*Peeler v. U.S. Dep't of Just., Drug Enf't Agency*, Case No. 11-CV-1261 (JBA), 2013 WL 4441528, at *4 (D. Conn. Aug. 15, 2013) (quoting *Kaminsky v. Nat'l Aeronautics & Space Admin.*, Case No. 08-CV-3313 (ARR) (LB), 2010 WL 276184, at *5 (E.D.N.Y. Jan. 19, 2010) *aff'd*, 402 F. App'x 617 (2d Cir. 2010). Therefore, an agency must simply make "a good faith effort to conduct a search for the requested records using methods which can reasonably be expected to produce the information requested." *Oglesby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). However, as recently concluded by the Second Circuit in a case of first impression, "an agency need not conduct a search that it has reasonably determined would be futile." *Whitaker v. Dep't of Com.*, 970 F.3d 200, 207 (2d Cir. 2020). In such a case, "the reasonable search required by FOIA may be no search at all." *Id.*

If the search turns up requested information, the Agency must then provide the information requested, unless it falls within a FOIA exemption, and provide "any information

that can be reasonably segregated from the exempt information." *Stroud,* 2023 WL 4405657, at *7 (*quoting* N.Y. *Times Co.*, 390 F. Supp. 3d at 511). If documents are withheld, or redactions are made, the defendant ordinarily bears the burden of showing that any such documents withheld, or redactions made, fall within an exemption to the FOIA. *Tarullo v. Department of Defense*, 170 F.Supp.2d 271, 274 (D. Conn. 2001). Thus, the agency prevails unless it "(1) 'improperly' (2) 'withheld' (3) 'agency records.'" *Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 142 (1989) (quoting *Kissinger v. Reps. Comm. for Freedom of Press*, 445 U.S. 136, 150 (1980)); *see also* 5 U.S.C. § 552(a)(4)(B); *Grand Cent. P'ship, Inc.,* 166 F.3d 473, 478 (2d Cir.1999); *Peeler,* Case No. 15-CV-169 (DJS), 2016 WL 730697, at *3.

Discovery is not normally part of litigation in FOIA cases and is not ordered when the agency provides submissions that are "adequate on their face." *See, Reprod. Rts. & Just. Project*, 490 F. Supp. 3d at FN 3 (quoting *Serv. Women's Action Network v. Dep't of Def.,* 888 F. Supp. 2d 231, 240 (D. Conn. 2012)). "[I]f the agency's submissions are facially adequate, summary judgment is warranted unless the plaintiff can make a showing of bad faith on the part of the agency or present evidence that the exemptions claimed by the agency should not apply." *Garcia v. Dep't of Justice*, 181 F.Supp.2d 356, 366 (S.D.N.Y. 2002). Declarations submitted by an agency are presumed to have been made in good faith. *Id.*; *see also, Carney v. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994). "The affidavits, however, must be 'reasonably detailed.'" *Id.* (quoting *Halpern v. F.B.I.*, 181 F.3d 279, 286 (2d Cir. 1999)). The Court must determine whether the detail in the declarations is *sufficient* to show a good faith effort, and the declarations need not be flawless. *Radcliffe v. I.R.S.*, 328 F. App'x 699, 700 (2d Cir. 2009). Furthermore, "affidavits . . . cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *Grand Cent. P'ship, Inc.*, 166 F.3d at 489 (internal

quotations omitted).

"A court may enter summary judgment for an agency in a FOIA case 'when the affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *Stroud*, 2023 WL 4405567, at *7 *(quoting Seife v. U.S. Food & Drug Admin.*, 43 F.4th 231, 238 (2d Cir. 2022)).

## IV.    ARGUMENT

### A. The DoD conducted a search reasonably calculated to uncover all responsive information.

Though Plaintiffs allege DoD's failure to timely respond to its FOIA requests violates FOIA, "so long as [an Agency] arrived at its belated determination after an adequate search, and did not act in bad faith, it is entitled to summary judgment under FOIA." *Flores v. United States Dep't of Just.*, Case No. 15-CV-2627 (JMA), 2016 WL 7856423, at *10 (E.D.N.Y. Oct. 4, 2016) (report and recommendation) (citing *Garcia*, 181 F. Supp. 2d at 366); *see also, Wu v. Nat'l Geospatial Intel. Agency*, Case No. 14-CV-1603 (DJS), 2017 WL 923906, at *5 (D. Conn. Mar. 8, 2017).

Plaintiffs challenge the search with respect to 14 subparts of three of their requests originally containing 28 subparts. See ECF No. 36, p. 2, ¶ 5. Essentially, after all responsive records located across the DoD were provided, Plaintiffs believes that certain additional information may exist, but was not located by DoD.  Specifically:

- Items 1, 3, 4, 5, 6, 8, 9, and 12 of "Re: FOIA Request for Records Underlying APHC Environmental Testing and Assessment Associated with U.S. Servicemembers Deployed in Uzbekistan" requesting *all records, reports, laboratory notes, testing data, draft reports, and correspondence related to the following previously released documents*, also

attached as exhibits, and cited documents available in the public domain, including records sufficient to show the methodologies of each test conducted for each document:

1. Any copies of the documents published by the online news organization McClatchy alongside their December 20, 2019, article titled "Cancers strike veterans who deployed to Uzbek base where black goo oozed, ponds glowed";

3. The November 16, 2001 "Preliminary Industrial Hazards Assessment, Uzbekistan, Operation Enduring Freedom";

4. "Final Environmental Site Characterization and Operational Health Risk Assessment, Stronghold Freedom, Karshi Khanabad Airfield, Uzbekistan 27 October – 27 November 2001";

5. The June 7, 2002 "Memorandum for Record" Subject: "Results of Air Monitoring, Building FOB 192, Camp Stronghold Freedom, Uzbekistan";

6. "Final Report Environmental Site Survey and Operational Health Risk Assessment Stronghold Freedom Karshi-Khanabad Airfield Uzbekistan 31 May – 14 June 2002";

8. "Final Report Environmental Assessment – Hardened Aircraft Shelters Stronghold Freedom Karshi-Khanabad Airfield Uzbekistan 6 June – 20 July 2002";

9. The August 4, 2002 Memorandum, Subject: "Report on Hardened Air Shelters (HAS) 17 Contamination";

12. The October 2004 "Final Report, Deployment Occupational and Environmental Health Site Assessment, Karshi-Khanabad Airbase, Karshi, Uzbekistan, 31 August – 11 September";

• Items 1, 3, and 5 of "Re: FOIA Request for Records Related to APHC Bioassay, Medical, and Environmental Information for U.S. Servicemembers in Uzbekistan" regarding all records in your possession related to occupational and environmental health at the Karshi-Khanabad base ("K2"), otherwise known as Camp Stronghold Freedom, in Uzbekistan, including but not limited to:

1. Copies of all questionnaires for biostatistical analysis that were collected during the 31 May – 14 June 2002 Environmental Assessment – Hardened Aircraft Shelters at K2, and referenced in 5.b. of that Final Report;

3. Anonymized copies of all medical logbooks from the period of October 2001 – July 2005 from medical facilities at K2 that document reasons for servicemembers' "sick call" visits;

11

> 5. Records sufficient to show levels of any nuclear or radioactive material detected in soil, water, plant, animal, human, or other mediums at any site within K2 or at any other site located in Uzbekistan;

> • Items 2, 3, and 6 of ""FOIA Request for USACHPPM Records Related to Public Health Information Associated with U.S. Servicemembers in Uzbekistan" relating to the Karshi-Khanabad base ("K2") in Uzbekistan from September 12, 2001 to present":

>> 2. All daily summaries, narrative reports, or other correspondence from USACHPPM staff to K2 leadership or forces stationed at K2, USACHPPM leadership, or any other recipient regarding K2;

>> 3. All reports submitted by United States military units to United States Central Command that pertain to environmental and occupational health conditions at K2;

>> 6. Any correspondence from K2 forces to higher levels in the chain of command regarding potential environmental or occupational health issues or toxic exposure concerns.

*Id.*; LRS ¶ 106.

The voluminous and broad production was a direct result of the broad requests from Plaintiffs. *Miller v. Casey*, 730 F.2d 773, 777 (D.C. Cir. 1984) ("The agency [is] bound to read [the FOIA request] as drafted, not as ... [plaintiff] might wish it was drafted."). While certain subparts of the complex series of requests may have been more specific, ultimately the request included a catchall request of "all records in your possession related to occupational and environmental health at [K2 in Uzbekistan] …" LRS ¶ 106.

## 1. DCPH-A's Search

Since DCPH-A was formerly known as the APHC, it is often referred to as such.[6] LRS ¶ 29. Generally, the Plaintiffs asked for records relating to K2 from September 12, 2001, to present. LRS ¶ 13.

---

[6]The mission of the DCPH-A is to "enhance Army readiness by identifying and assessing current and emerging health threats, developing and communicating public health solutions, and

DCPH-A conducted a thorough search of both classified and unclassified systems. LRS ¶¶ 32-38. The expansive search included numerous network drives, physical files, and internet-based portals as described in its search declaration. LRS ¶ 37. DCPH-A tailored its search based on the FOIA requests and employed an exhaustive search of locations with potentially responsive information. LRS ¶¶ 32-38. The search was reasonably expected to uncover responsive documents at DCPH-A, to the extent responsive information existed. *Id*. The search yielded approximately 150 documents consisting of several thousands of pages of information. LRS ¶ 38.

### 2. CENTCOM's Search

CENTCOM[7] searched for responsive information based on the Plaintiffs' requests and based on subsequently provided additional information by Plaintiffs to assist CENTCOM in locating a certain document Plaintiffs believed existed based on an article behind a paywall at a McClatchy weblink and embedded in a McClatchy news article. LRS ¶ 73.

Searches were conducted in the most reasonable locations at CENTCOM containing stored documents, emails, videos, photos, and correspondence logically related to Plaintiff's

---

assuring the quality and effectiveness of the Army's Public Health Enterprise." LRS ¶ 30. The mainstay of the DCPH-A products is technical reports and epidemiological assessments concerning environmental health. LRS ¶ 31.

[7]CENTCOM is one of 11 combatant commands of the United States armed forces. LRS ¶ 61. It directs and enables military operations and activities with allies and partners in support of the National Defense Strategy to increase regional security and stability in support of enduring United States interests within its Area of Responsibility ("AOR"). *Id*. At present, USCENTCOM's AOR includes 21 nations in the Middle East, Central and South Asia, and the strategic waterways that surround them. LRS ¶ 62. Prior to 2008, USCENTCOM's AOR also included seven African nations. LRS ¶ 63. USCENTCOM constitutes a headquarters element without any military units permanently assigned to it. LRS ¶ 64. USCENTCOM operates with component commands within its AOR – one for each of the U.S. armed services, along with a joint special operations component and a number of subordinate joint task forces. LRS ¶ 65.

FOIA request, to include a) electronic locations comprising of the Non-classified Internet Protocol Router Network (NIPR); Secured Internet Protocol Router Network (SIPR); Joint Worldwide Intelligence Communications System (JWICS) Shared Drives; Emails; NIPR/SIPR Web Portals and Content Manager (CM), as well as b) physical locations comprising of the surgeon's (medical) office space, the public affairs office space (media), and the legal office. LRS ¶ 74. CENTCOM tailored its search to the requests and follow-on information provided by Plaintiffs and employed an exhaustive search of locations with potentially responsive information reasonably expected to uncover any responsive documents at CENTCOM, to the extent responsive information existed. LRS ¶¶ 72-80.

On October 19, 2023 CENCTOM, informed Plaintiffs that it located potentially responsive information and determined that it fell under DCPH-A for processing and referred Plaintiffs' request to DCPH-A for processing and a direct response to Plaintiffs. LRS ¶ 75.

On November 8, 2023, Defendant, through DOD OSD and counsel, provided Plaintiffs with 18 pages of responsive material with minimal redactions pursuant to Exemption 6 and Exemption 3. LRS ¶ 76. 23 pages were withheld in full pursuant to Exemptions 5 and 6. LRS ¶ 77.

Also on November 8, 2023, CENTCOM informed Plaintiffs that it located potentially responsive information available for download from the DCPH-A website. LRS ¶ 78. CENTCOM further informed Plaintiffs that other potentially responsive information that was located was determined to fall under the NGA and that CENTCOM had referred Plaintiffs'

request to the NGA for processing and a direct response to Plaintiffs. LRS ¶ 79.[8]

### 3. SOCOM's Search

As noted above, SOCOM[9] communicated to Plaintiffs that the information they requested would not be reasonably maintained by SOCOM, yet Plaintiffs alleged in their complaint they were "never provided a formal written response with notice of administrative appellate routes, nor did they re-direct the request elsewhere within DoD," this despite Plaintiffs already having provided requests to OSD, CENTCOM, DoD IG, and DCPH-A. LRS ¶ 88-89.

Based upon mission and area of operations, SOCOM determined the requested information or records, if they existed, might be with CENTCOM or DCPH-A. *Id*. Even though the requested records would not be information or records one would expect SOCOM to maintain, SOCOM directed its Surgeon General's Office's Force Health Protection section to

---

[8]NGA received the document via classified channels on November 11, 2023, at which point the NGA began its own processing steps for its production. The DoD produced this eleven-page document to Plaintiffs on February 8, 2024. LRS ¶ 125.

[9]USSOCOM was established as a combatant command pursuant to the Nunn-Cohen Amendment to the 1987 Department of Defense Authorization Act. LRS ¶ 82. As a Service-like entity, USSOCOM develops Special Operations Forces ("SOF") strategy, doctrine, and tactics; develops budgets for SOF; develops and acquires SOF-peculiar equipment with its own unique funds known as Major Force Program-11 Funds; organizes, trains, and equips SOF, and monitors the management of SOF personnel in that USSOCOM coordinates on Military Department and Military Service personnel management policy and plans as they relate to accessions, assignments, compensation, promotions, professional development, readiness, retention, sustainment, and training of all SOF personnel.  LRS ¶ 85. USSOCOM's mission is to develop and employ fully capable SOF in order to conduct global special operations and activities as part of the Joint Force to support persistent, networked, and distributed Combatant Command operations and campaigns against state and non-state actors to protect and advance U.S. policies and objectives. LRS ¶ 86. SOF's core activities include direct military action, special reconnaissance, countering weapons of mass destruction, counterterrorism, unconventional warfare, foreign internal defense, security force assistance, hostage rescue and recovery, counterinsurgency, foreign humanitarian assistance, military information support operations, civil affairs and other such activities as may be specified by the President or the Secretary of Defense. LRS ¶ 87.

search for potentially responsive records. LRS ¶ 90.[10]  SOCOM determined it is not likely that other offices or directorates within SOCOM would have potentially responsive records as the requested records would not fall within other Directorates' function or area of responsibility because the requested information or records, if stored at SOCOM, would fall strictly under the Surgeon's General's purview and function. LRS ¶ 91.

SOCOM began to transition from paper records to electronic records in the summer of 2003, which it completed by 2010. LRS ¶ 92. As such, at the time of the search there was no place within the Force Health Protection section where paper records were maintained, as once paper records were scanned, they were then shredded. *Id*. SOCOM searched classified and unclassified systems, including the SOCOM Portal and Share Point site. LRS ¶ 93. Searches of both the classified and unclassified systems included the search of the SOCOM Surgeon General's records as well as across the SOCOM Enterprise. LRS ¶ 94. SOCOM tailored its search so that it would be reasonably expected to uncover responsive documents at SOCOM, to the extent responsive information existed.  LRS ¶ 95.

After a search of its systems, 4 records were located on the unclassified system which did not originate from SOCOM, and they were subsequently referred to other DoD subcomponents for review and a final release determination. LRS ¶ 96. These DoD entities were DCPH-A (two documents), CENTCOM (one document), and USASOC (one document). LRS ¶¶ 41, 80, 96, and 107.

---

[10]SOCOM would likely have been justified in determining such a search would be futile and to not have performed a search. *See e.g*., *Whitaker,* 970 F.3d at 207.

The search fundamentally confirmed SOCOM's assertion to Plaintiffs (of which DoD OSD concurs) that the type of information Plaintiffs requested would not originate with SOCOM and was more likely to be found with DCPH-A or CENTCOM. LRS ¶ 99.

### 4. OSD's Search

As noted above, once the requests were the subject of litigation, Agency Counsel at DoD OSD assumed responsibility for both processing the requests to OSD and coordinating the overall response to the universe of records from the multiple DoD subcomponents. LRS ¶ 97. With a global view of all of the requests, DoD OSD was better able to determine which subcomponents within DoD could have responsive records. LRS ¶ 98.

While DoD OSD has an office that is tracking K2 environmental and occupational health concerns, *i.e.* the Assistant Secretary of Defense for Health Affairs ("ASDHA"), its focus is on high-level policy based upon factual input from subordinate components, such as DHA or DCPH-A, in order to advise SECDEF or reply to inquiries from the Press or Congress. LRS ¶¶ 101-03. Though DoD OSD assessed it would be unlikely for it to possess non-duplicative documents of those maintained by DCPH-A, such that a search would be futile, out of an abundance of caution, DoD OSD conducted a search reasonably calculated to discover all responsive records, to the extent they exist. LRS ¶ 100. [11]

ASDHA confirmed that it does possess responsive records, but that those records are duplicative of the records located by DCPH-A. LRS ¶ 102. The only records located by ASDHA were copies of DCPH-A K2 environmental and occupational health assessments, which were

---

[11]DoD OSD would also likely have been justified in determining such a search would be futile. *Id*.

provided to Congress and were included in the set of records provided to Plaintiff by DCPH-A. LRS ¶ 104.

ASDHA would not possess any underlying documents, data, or communications at the unit level that were used to create any of the final reports provided to Congress, to the extent such underlying documents even exist. LRS ¶ 105. DoD OSD assessed that ASDHA was highly unlikely to possess responsive or non-duplicative records and that the burden of collecting every responsive record to compare with every DCPH-A record would be futile and would not be a sound use government resources of tax-payer monies. LRS ¶ 106.

Ultimately, OSD's declaration, as well as CENTCOM, DCPH-A, and SOCOM's declarations outlined above, satisfactorily detail DoD's good faith effort to conduct a search using methods reasonably expected to produce the information requested by Plaintiffs.[12] Put another way, the declarations established that Defendant properly searched for documents responsive to Plaintiffs' FOIA requests. These good-faith searches yielded thousands of pages of non-exempt records produced to Plaintiffs over a period of five months.

While Plaintiffs may believe more documents responsive to their request exist (or once existed) within the DoD and that the searches should have produced more documents, such a speculative argument is not valid under FOIA where the numerous declarations establish that Defendant conducted reasonable searches. Indeed, in the event that an agency does not find certain requested information (or every single requested piece of information in multi-part requests), the Supreme Court has held that the FOIA does not require agencies to create documents or "explanatory material." *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 162 (1974).

---

[12]*See Oglesby*, 920 F.2d at 68.

The numerous declarations outline Defendant's search and speak to the significant man-hours devoted to ensuring a thorough search in response to the very complex series of requests. The detailed declarations evidence reasonable searches, and undoubtedly by Defendant DoD taken together. *See e.g.*, *Miles v. Dep't of Just.*, 201 F. Supp. 3d 185, 186–87 (D.D.C. 2016) ("Together, these declarants set forth facts sufficient to enable the Court to conclude that the defendants made the necessary good faith effort, and that it was reasonable to expect that the methods utilized would have produced the requested information."). Therefore, summary judgment should be granted to Defendant.

### B. DoD Properly Redacted Withheld Portions of the Requested Information in Accordance with FOIA Exemptions 1, 3, 5 and 6.

#### 1. DCPH-A

##### a. Exemption 1

DCPH-A redacted properly classified information which is accordingly exempt from disclosure under Exemption 1.

The President of the United States is responsible for protecting national security and has the power to develop policies regarding classification, such as through executive order.[13]   FOIA Exemption 1 protects records that are: "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy[,] and (B) are in fact properly classified pursuant to such Executive order[.]" 5 U.S.C. § 552(b)(1); *accord, e.g.*, *Weinberger v. Cath. Action of Haw.*, 454 U.S. 139, 144 (1981).  As such, properly classified information is exempt from disclosure under Exemption 1. *Id.* at 144-45; *see also*

---

[13]*See e.g.*,*Classified National Security Information*, Exec. Order No. 13,526, 75 Fed. Reg. 707, 2009 WL 6066991( (Dec. 29, 2009).

*Council on Am.-Islamic Rels. - Connecticut v. U.S. Citizenship & Immigr. Servs.*, 669 F. Supp. 3d 64, 88 (D. Conn. 2023).

   To be properly classified pursuant to Exemption 1, the information must meet the requirements of Executive Order ("E.O.") 13,526:

   (1) an original classification authority is classifying the information;

   (2) the information is owned by, produced by or for, or is under the control of the United States Government;

   (3) the information falls within one or more of the categories of information listed in section 1.4 of [E.O. No. 13,526]; and

   (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

*Classified National Security Information*, E.O. No. 13,526, 75 Fed. Reg. 707, 2009 WL 6066991 (Dec. 29, 2009). The Executive Order lists three classification levels for national security information as being top secret, secret, and confidential. *Id.* § 1.2.

   When an agency withholds classified information pursuant to Exemption 1, the affidavit in support of that decision is entitled to "substantial weight." *ACLU v. Dep't of Justice*, 681 F.3d 70 (2d Cir. 2023); *see also, Council on Am.-Islamic Rels.,* 669 F. Supp. 3d at 88. "Courts adopt a deferential posture in FOIA cases regarding the uniquely executive purview of national security." *Council on Am.-Islamic Rels.,* 669 F. Supp. 3d at 88 (quoting *Larson v. U.S. Dep't of State*, 565 F.3d 857, 865 (D.C. Cir. 2009) (internal quotations omitted); *see also Osen LLC v. United States Cent. Command*, 969 F.3d 102, 115 (2d Cir. 2020) ("We have repeatedly found

that it is appropriate to defer to executive declarations predicting harm to the national security, and have found it unwise to undertake searching judicial review.") (cleaned up; internal quotations and citations omitted)); *CIA v. Sims 471* U.S. 159, 179-80 (1985) (National security officials are uniquely positioned to view "the whole picture" and "weigh the variety of subtly and complex factors" in order to determine whether the disclosure of information would damage national security.).

Executive agencies do not carry a high burden in their declarations on proper classifications. *See Morley v. CIA*, 508 F.3d 1108, 1124 (D.C. Cir. 2007) ("Little proof or explanation is required beyond a plausible assertion that information is properly classified."); *Council on Am.-Islamic Rels.,* 669 F. Supp. 3d at 88 (same); *Schwartz v. Dep't of Def.*, Case No. 15-CV-7077 (ARR) (RLM), 2017 WL 78482, at *15 (E.D.N.Y. Jan. 6, 2017) (explaining that the agencies' "burden is a 'light one' in the national security context") (citation omitted); *New York Times Co. v. Dep't of Def.*, Case No. 19-CV-5779 (GBD), 2021 WL 3774410, at *3 (S.D.N.Y. Aug. 25, 2021) (Government's explanations support the determination despite "facially intriguing" arguments from the plaintiff).

Here, Rear Adm. Paul Spedero, Jr., U.S.N., a Secretary of Defense authorized TOP SECRET and SECRET original classification authority ("OCA") reviewed the four DCPH-A documents for which Exemption 1 redactions were applied. LRS ¶ 44. As the Vice Director of Operations, Rear Adm. Spedero assists in the execution of all DoD operational matters outside of the continental United States. LRS ¶ 45.

Rear Adm. Spedero has extensive experience and education concerning national security. LRS ¶ 46. As the Vice Director of Operations, he receives and reviews daily operational plans and briefings, reports, and intelligence analyses from the Combatant Commands, the Joint Staff,

and the Intelligence Community. *Id*. Rear Adm. Spedero also assists with the supervision of the National Military Command Center, which is responsible for monitoring worldwide events affecting national security and U.S. interests twenty-four hours a day, seven days a week. LRS ¶ 47. Rear Adm. Spadaro is familiar with both this FOIA action and the requirements surrounding FOIA Exemption 1 and Executive Order 13526. LRS ¶¶ 48-49.

Rear Adm. Spedero avers the four health and site assessments provided the data collected and the conclusions reached without redaction. LRS ¶ 51. The very limited information that was withheld concerned the classified sources of certain background information and would provide no substance that could aid Plaintiffs' knowledge of the environmental conditions near K2. LRS ¶ 52.

Rear Adm. Spedero also avers that minimal Exemption 1 redactions consisted of 1) classified intelligence sources and procedures, 2) classified images of particular locations, or 3) references in endnotes that would reveal the sources of intelligence collection. LRS ¶ 54. The imagery withheld was provided by NGA, and revealing the sources and methods of intelligence assessments of foreign lands could allow those with nefarious intent to attempt to evade collection or analyze the capabilities of such sources to either alter practices or attempt to exploit vulnerabilities. LRS ¶ 55-56.[14]

In his review of the documents and redacted classified information, Rear Adm. Spedero determined that the unauthorized disclosure of the information withheld under Exemption 1 could reasonably be expected to result in at least serious damage to the national security. LRS ¶ 57. He avers that certain redacted information in the requested records is, and should remain,

---

[14]This information is also withheld for the reasoning described in more detail below at Section 4.a.

classified consistent with Executive Order 13526; has not been made to conceal violations of law, inefficiency, or administrative error; has not been made to prevent embarrassment to a person, organization, or agency; to restrain competition; nor has it been made to prevent or delay the release of information that does not require protection in the interests of national security. LRS ¶ 58.

Rear Adm. Spedero's review consisted of a page-by-page and line-by-line examination of each document to confirm that any non-exempt portions were segregated from the exempt portions and the non-exempt portions were produced. LRS ¶ 59. No other meaningful information in the documents could be discerned without disclosing information warranting protection under the law. LRS ¶ 60.

Based upon Rear Adm. Spedero's credible assertions, the redacted information by DCPH-A is properly classified information and is accordingly exempt from disclosure under Exemption 1. As such, summary judgment should be granted to Defendant.

**b.  Exemption 3**

DCPH-A avers certain information is protected by 10 U.S.C. § 130b, *Personnel in overseas, sensitive, or routinely deployable units: nondisclosure of personally identifying information*, and that it therefore appropriately redacted certain information in accordance with FOIA Exemption 3.

Exemption 3, U.S.C. § 552(b)(3), allows the withholding of information prohibited from disclosure by another statute. Specifically, an agency may withhold information if:

**(3)** specifically exempted from disclosure by statute (other than section 552b of this title), if that statute--
**(A)(i)** requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or

(ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and

(B) if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.

5 U.S.C. § 552(b)(3). "Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage." *Reilly v. Dep't of Just.*, Case No. 3:16-CV-2024 (VLB), 2018 WL 1582547, at *4 (D. Conn. Mar. 30, 2018) (quoting *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 72 (2d Cir. 2009)).

One such relevant statue within FOIA's coverage under Exemption 3 is 10 U.S.C. § 130b. This statute permits the Department of Defense to, "with[hold] from disclosure to the public personally identifying information regarding…any member of the armed forces assigned to an overseas unit, a sensitive unit, or a routinely deployable unit; and any employee of the Department of Defense or of the Coast Guard whose duty station is with any such unit." 10 USC 130b(a). The term personally identifying information ("PII") means, "the person's name, rank, duty address, and official title and information regarding the person's pay." 10 USC 130b(c)(1). "There is no dispute that 10 U.S.C. § 130b qualifies as a withholding statute under Exemption 3." *New York Times Co.*, Case No. 19-CV-5779 (GBD), 2021 WL 3774410, at *4) (*citing Connell v. United States S. Command*, 2020 WL 6287467, at *3 (D.D.C. Oct. 27, 2020); *see also Bloche v. Dep't of Def.*, 370 F. Supp. 3d 40, FN 6 (D.D.C. 2019) (Redactions were proper for the names of non-senior military interrogators and other individuals contained within Navy 42); *Freedom Watch, Inc. v. Dep't of the Navy*, Case No. 13-CV-420 (OC) (PRL), 2014 WL 12571426, at FN 11 (M.D. Fla. Dec. 8, 2014) ("The persons names redacted on these 19 forms were such members of the armed forces.").

DCPH-A identified names, signatures, contact information, or a combination thereof, of military members and DoD employees who were either assigned to deployed units or routinely deployable units, including the 71st Medical Detachment, 172nd Medical Detachment, and the Coalition Forces Land Component Command (CFLCC), with regular deployments to countries such as Afghanistan, Uzbekistan, and/or Kuwait. LRS ¶ 40. DCPH-A has cited a relevant statute that allows for the withholding of the abovementioned PII in accordance with FOIA Exemption 3. Therefore, summary judgment should be granted to Defendant.

### c. Exemption 6

DCPH-A appropriately weighed public and privacy interests, considered the foreseeable harm standard and, therefore, properly redacted portions of the requested information in accordance with FOIA exemption 6.

FOIA Exemption 6 protects against disclosure information that implicates personal privacy interests. The government is justified in withholding such information when its release "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). "Privacy interests include . . . the interest in keeping personal facts and identifying information such as names, addresses, and other personal information away from the public eye." *Stroud*, No. 22-CV-00799 (KAD), 2023 WL 4405657, at *7 (quoting *Assoc. Press*, 554 F.3d at 284) (internal quotations marks omitted). "To determine whether Exemption 6 applies requires balancing an individual's right of privacy against the public purpose to be served by disclosure." *Fed. Lab. Rels. Auth. v. U.S. Dep't of Veterans Affs.*, 958 F.2d 503, 505 (2d Cir. 1992) (citing *Rose,* 425 U.S. at 372).

Defendant DoD has provided Plaintiffs with thousands of pages of memoranda, reports, data, and other information related to environmental testing at K2. LRS ¶ 38. Generally, these documents were investigative occupational and environmental health information maintained in the files of a public health entity. *Id*. The information produced contained minor redactions of the names, signatures, contact information, or a combination thereof, of military members who are at the military rank of Colonel or below and at the rank of GS-15 or below. LRS ¶ 39. DCPH-A considered the foreseeable harm standard when reviewing responsive records and applying the FOIA exemptions and maintains that disclosure would reasonably harm an interest protected by an exemption. LRS ¶ 43.

"[T]he court must first determine whether the information to be redacted is found in 'personnel, medical, or similar files'" which is "broadly defined as 'detailed Government records on an individual which can be identified as applying to that individual.'" *Stroud*, No. 3:22-CV-00799 (KAD), 2023 WL 4405657, at *7 (quoting *Cook v. Nat'l Archives & Recs. Admin.*, 758 F.3d 168, 174 (2d Cir. 2014)). In broadly defining Government records, Congress did not intend for analysis under Exemption 6 to turn on the label of a file or for narrow readings of a personnel, medical, or similar file, but rather sought to protect disclosure of information that might harm an individual. *See e.g.*, *Seife v. United States Dep't of State*, 298 F. Supp. 3d 592, 623 (S.D.N.Y. 2018). FOIA Exemption 6 "exempt[s] not just files, but also bits of personal information, such as names and addresses, the release of which would create a palpable threat to privacy." *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 152 (D.C. Cir. 2006) (cleaned up; citation and internal brackets and quotation marks omitted); *see also Unidad Latina En Accion v. U.S. Dep't of Homeland Sec.*, 253 F.R.D. 44, 48 (D. Conn. 2008). In short, "[t]he first step of the Exemption 6 inquiry is not a difficult hurdle to clear, as the Second Circuit considers a record a

similar file if it contains personal information identifiable to a particular person." *Buzzfeed, Inc. v. U.S. Dep't of the Air Force*, Case No. 19-CV-01337 (ALC) (SN), 2020 WL 6490864, at *4 (S.D.N.Y. Nov. 3, 2020) (cleaned up; internal quotation marks and citations omitted).

Here, the documents in question mainly involve investigative occupational and environmental health information collected by medical personnel, which contain the names, signatures, contact information, or a combination thereof, of lower ranking DoD employees, and is clearly a "personnel, medical, or similar file" under FOIA Exemption 6.

The crux of Plaintiffs' FOIA requests, and subsequent complaint, is to find alleged "missing information" they believe will indicate "what toxins [veterans of k2] were exposed to while serving at Karshi-Khanabad" and "crucial to adequate medical treatment." ECF No. 1 ("Compl.") ¶¶ 6-8. However, while one might be sympathetic to this endeavor, as the release under FOIA makes information "publicly available," neither "'the identity of the requesting party' nor 'the particular purpose for which the document is being requested' is relevant." *Horowitz v. Peace Corps*, 428 F.3d 271, 278 (D.C. Cir. 2005) (quoting *Reps. Comm.*, 489 U.S. at 771-72). The requester has the burden to show how the disclosure would shed light on the operations of an agency. *NARA v. Favish*, 541 U.S. 157, 172 (2004).

Nowhere in Plaintiffs' one hundred-two paragraph complaint or attachments, do they indicate that the name, addresses, or contact information of the DoD personnel collecting data or conducting the environmental and occupational health reports, would shed light on the operations of the DoD. Plaintiffs state that they seek information that "could contain information that would allow healthcare providers to know with greater certainty the type and quantity of toxic substances that Karshi-Khanabad veterans were exposed to . . . [t]o better inform the public

of the risks these veterans faced and to facilitate veteran's efforts to provide their doctors with the information doctors need to perform their jobs. . ." Compl. ¶¶ 77-78.

"Where public interest favoring disclosure is no more than minimal, a lesser privacy interest suffices to outweigh it." *Long v. Off. of Pers. Mgmt.*, 692 F.3d 185, 194 (2d Cir. 2012) (*citing*, *U.S. Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. at 500, 114 (1994)). Here, revealing the identities of lower ranking DoD personnel involved in the testing or reporting at K2, would add little to nothing to the public's understanding of how the agency performed its duties since data and reports located in DCPH-A's search have been disclosed. *See e.g., Wood v. F.B.I.*, 432 F.3d 78, 88–89 (2d Cir. 2005) (concluding that the "identities of the investigators assigned to the case would add little to the public's understanding of how the FBI's [Office of Primary Responsibility] performed its duties given that the existence of the internal investigation and its outcome has been disclosed.") (citing *Fed. Lab. Rels. Auth. v. U.S. Dep't of Veterans Affs.*, 958 F.2d 503, 512 (2d Cir. 1992)); *see also*, *Hopkins*, 929 F.2d at 88 ("[N]ames and addresses sought by appellant would shed no light on HUD's performance in enforcing the prevailing wage laws" and compelling disclosure for the purpose of allowing a Union to contact the individuals to dispute accuracy of data "would be so attenuated a relationship to a governmental activity that it would eviscerate the FOIA privacy exemptions."); *Pavement Coatings Tech. Council v. United States Geological Surv.*, 995 F.3d 1014, 1024 (D.C. Cir. 2021) (finding Plaintiff "has the data it needs to replicate the USGS scientists' analysis [of a 2010 house dust study]" and release study participants addresses "serves no cognizable public interest because it would shed no additional light on the Survey[]…") (citation omitted); *Concepcion v. FBI*, 606 F. Supp. 2d 14, 35-39 (D.D.C. 2009) (upholding redaction of the names of third parties in investigative files under Exemption 6.); *Appleton v. FDA*, 451 F. Supp. 2d 129, 145-46

(D.D.C. 2006) (upholding redaction of the names of drug company employees and information identifying interviewees and other individuals in investigation files pursuant to Exemption 6.).

Conversely, the interest of DoD personnel in preventing public disclosure of their names, signatures, and contact information, is obviously present. *See e.g., Vietnam Veterans of Am. Connecticut Greater Hartford Chapter 120 v. Dep't of Homeland Sec.*, 8 F. Supp. 3d 188, 230 (D. Conn. 2014) ("[I]n light of the fact that rank, dates of service and place of last assignment could be used by knowledgeable individuals to link the service member to highly sensitive material and it is not apparent how this information would shed light on the defendants' use of personality and adjustment disorder discharges, the court finds that redaction was appropriate.); *Walston v. United States Dep't of Def.*, 238 F. Supp. 3d 57, 67 (D.D.C. 2017) ("names, email addresses, phone numbers, signature blocks, and office locations of the low-level DISA employees" were properly withheld.); *Baldwin v. U.S. Dep't of Energy*, Case No.18-CV-1872 (EGS), 2020 WL 376563, at *5 (D.D.C. Jan. 23, 2020) ("DOE properly withholds the mobile telephone numbers and conference call number from the email chains described in the Vaughn Index.").

Further, Plaintiffs allege "[m]any conclusions in the released reports are not consistent with earlier reports and accounts from Karshi-Khanabad veterans, and these disparities are inadequately explained by the reports that Defendant has released thus far." Compl. ¶ 67. The relatively lower ranking DoD personnel have a strong privacy interest in being free from any undue exposure or potential harassment. See e.g., *Long,* 692 F.3d at 192 ("It is not uncommon for courts to recognize a privacy interest in a federal employee's work status (as opposed to some more intimate detail) if the occupation alone could subject the employee to harassment or attack."). That is, just by the appearance of the DoD personnel's names and PII in produced

documents in this litigation, that they have any connection to the alleged discrepancies or alleged missing information important to the health of K2 veterans.

As it is not apparent how any of the minor Exemption 6 redactions would shed light on how the DoD performed its duties, let alone the stated purpose of Plaintiffs' requests and complaint, the public's interest in knowing the identities of the DoD personnel involved can only be said to be "minimal at best" which "is insufficient to overcome the employees' interest in preventing the public disclosure of their names." *Wood*, 432 F.3d at 89. DCPH-A appropriately weighed public and privacy interests, considered the foreseeable harm standard and, therefore properly redacted portions of the requested information in accordance with FOIA exemption 6; therefore, summary judgment should be granted to Defendant.

### 2. CENTCOM

On November 8, 2023, Defendant, through DOD OSD and counsel, provided Plaintiffs with 18 pages of responsive material with minimal redactions pursuant to Exemption 3 and Exemption 6. LRS ¶ 76. 23 pages were withheld in full pursuant to Exemptions 5 and 6.  LRS ¶ 77. On November 15, 2023, CENTCOM informed Plaintiffs that it was partially releasing two pages to Plaintiffs from a referral by SOCOM with redactions pursuant to Exemptions 3 and 6. LRS ¶ 80. CENTCOM properly redacted and withheld this information in accordance with the cited FOIA exemptions.

### a. Exemption 3

CENTCOM appropriately redacted certain information in accordance with FOIA Exemption 3. Specifically, CENTCOM avers that the two names redacted at the bottom of the second page of an information paper are protected by 10 USC § 130b because the two individuals were operations officers assigned to CENTCOM. LRS ¶ 76. At the time, members of

CENTCOM were rotating in and out of the combat theater in Afghanistan. *Id.* For the same reason, CENTCOM also redacted certain names on the document referred to it by SOCOM. LRS ¶ 80.

As such, and the reasons set forth above in Section IV.B.1.b., CENTCOM properly invoked a relevant statute, 10 USC § 130b, and averred the withheld material is within the statute's coverage. Accordingly, the information is properly withheld under Exemption 3. Therefore, summary judgment should be granted to Defendant.

### b. Exemption 5

CENTCOM appropriately withheld certain information in accordance with FOIA Exemption 5, which allows an agency to exempt information that is normally privileged in the civil discovery context. LRS ¶ 77. CENTCOM asserts the deliberative process privilege and attorney-client privilege. *Id*.

Pursuant to FOIA Exemption 5, the DoD and other federal agencies are permitted to withhold "inter-agency and intra-agency memorandums or letters, which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Put differently, Exemption 5 incorporates civil litigation privileges. "Courts universally read Exemption 5 to mean that agency documents that would be privileged in ordinary civil discovery are also protected from disclosure under FOIA." *Am. Oversight v. United States Dep't of Just.*, 45 F.4th 579, 588 (2d Cir. 2022) (cleaned up; citation, internal quotation marks, and brackets omitted). As such, Exemption 5 includes protections for the deliberative process privilege, the attorney-client privilege, and for attorney work-product. *See e.g., Tigue v. U.S. Dep't of Just.*, 312 F.3d 70, 76-77 (2d Cir. 2002); *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854,

863-64 (D.C. Cir. 1980); *Kroposki.* No. 08-CV-01519 (AWT), 2010 WL 11565869, at *3. Congress' incorporation of the attorney's work-product privilege in Exemption 5, included "such work-product protection" for government attorneys. *Am. Oversight*, 45 F.4th at 588 (citations omitted).

In the FOIA context, a court must determine only whether the information at issue would "routinely" be disclosed in civil litigation. *United States v. Weber Aircraft Corp.*, 465 U.S. 792, 799 (1984) (citation omitted). In this way it differs from civil litigation, where privileges require a balancing. *See, Fed. Trade Comm'n v. Grolier Inc.*, 462 U.S. 19, 28 (1983). Under FOIA, to properly withhold information under Exemption 5, an agency need only make a threshold showing that information would ordinarily be protected by one or more privileges. *See Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008).

The deliberative process privilege is "a sub-species of work-product privilege that covers documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated . . ." *Tigue*, 312 F.3d at 76 (quoting *Dep't of the Interior v. Klamath Water Users Protective Ass'n,* 532 U.S. 1, (2001) (internal quotation marks omitted). "The rationale behind this privilege is the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions, by protecting open and frank discussion among those who make them within the Government." *Id.* (quoting *Klamath*, 532 U.S. at 8-9).

"To withhold a responsive record, an agency must show both that the record falls within a FOIA exemption . . . and that the agency reasonably foresees that disclosure would harm an

interest protected by [the] exemption." *Machado Amadis v. United States Dep't of State*, 971 F.3d 364, 370 (D.C. Cir. 2020) (internal citation and quotation marks omitted).

CENTCOM provides a very detailed explanation of what it has withheld under this exemption, including: internal staff paper processing forms; drafts of an information paper; pre-decisional staff action processing memos; draft memoranda; memoranda used to process the drafts; and emails circulating and discussing the drafts. LRS ¶ 77.

CENTCOM explains that the data is pre-decisional because they memorialize analysis and advice provided to the command prior to the final information being sent to Congress. *Id.* Additionally, the drafters of the documents were not in a position to make any decisions regarding the information in the documents. *Id.* CENTCOM also explains that the memoranda are deliberative, as they represent the opinions, advice, analysis, and recommendations conveyed during the command's decision-making process. *Id.* The information was conveyed to help influence and inform the decision, and is not a recitation of a final policy, position, or decision. *Id.* Additionally, among the pre-decisional staff processing memos, is a memorandum authored by a CENTCOM attorney providing legal advice to command. *Id.*

CENTCOM avers that the release of this information would cause harm to the command's decision-making process, as it would hamper the unfettered and candid advice of those making recommendations, if that advice is no longer kept confidential. LRS ¶ 77. "Indeed, agencies are, and properly should be, engaged in a continuing process of examining their policies, and courts should be very wary of interfering with this process." *Council on Am.-Islamic Rels. - Connecticut*, 669 F. Supp. 3d at 84 (quoting *Nat. Res. Def. Council v. United States Env't Prot. Agency*, 19 F.4th 177, 192 (2d Cir. 2021)); *see also*, *Machado Amadis*, 971 F.3d at 370 (Agency permissibly withheld the privileged information as it "correctly understood

the governing legal requirement and reasonably explained" that, among other things, "disclosure of that information 'would' chill future internal discussions.") (citation omitted)). CENTCOM reviewed the information, page-by-page and line-by-line, in order to confirm that any non-exempt portions were segregated from exempt portions, and that no other meaningful information could be discerned without disclosing protected information. LRS ¶ 77.

Here, CENTCOM appropriately withheld certain information in accordance with FOIA Exemption 5, as it appropriately explained that the information was either attorney-client privileged material and/or of the pre-decisional, deliberative-type which Exemption 5 protects, and that the disclosure of this information would harm CENTCOM's interests, *i.e.* chill candid advice within its command decision-making process. As such, summary judgment should be granted to Defendant.

### c. Exemption 6

CENTCOM appropriately redacted certain names in accordance with FOIA Exemption 6. Specifically, CENTCOM avers that it withheld information within the 18-pages it released from its search with respect to relatively low-ranking individuals who are not the type of decision makers who are typically held accountable by the public, whose identities are not typically relevant or of interest to the public, and for which there is no public interest outweighing the significant personal privacy interests involved.  LRS ¶ 76. For the same reason, CENTCOM also redacted certain names on the document referred to it by SOCOM. LRS ¶ 80. Additionally, portions of the information withheld under Exemption 5, discussed above, would also be appropriately withheld under Exemption 6. LRS ¶ 77. In redacting the personal information, CENTCOM considered the foreseeable harm standard when reviewing responsive records and

applying the FOIA exemptions and maintains that disclosure would reasonably harm an interest protected by an exemption. LRS ¶¶ 76-77, 80.

As such, and for the reasons set forth above in Section IV.B.1.c., CENTCOM appropriately weighed public and privacy interests, considered the foreseeable harm standard and, therefore properly redacted portions of the requested information in accordance with FOIA exemption 6; accordingly, summary judgment should be granted to Defendant.

### 3.  USASOC

On or about July 27, 2023, SOCOM referred a one-page document for USASOC to process. LRS ¶ 107.[15] On or about August 31, 2023, USASOC released the one-page document with minor redactions pursuant FOIA Exemptions 3 and 6. LRS ¶ 109. The document was produced to Plaintiffs through DoD agency counsel. LRS ¶ 110.

The redacted names were individuals from a routinely deployable unit. LRS ¶ 108. The names were also of a relatively low rank who were not the type of decision makers typically held accountable by the public, whose identities are not typically relevant or of interest to the public, and for which there is no public interest outweighing the significant personal privacy interests involved. *Id.* USASOC also considered the foreseeable harm standard when reviewing this referred record by SOCOM and applying the FOIA exemptions and maintains that disclosure would reasonably harm an interest protected by an exemption. *Id.*

As such, and for the reasons set forth above in Sections IV.B.1.b-c. and B.2.a., summary judgment should be granted to Defendant.

---

[15]USASOC's mission is to prepare for any conflict and arm the joint force with the world's premiere Army special operations forces. LRS ¶ 108.

### 4. NGA

NGA released to Plaintiffs an 11-page document referred to it by CENTCOM with redactions pursuant to Exemption 1. LRS ¶ 111.

### a. Exemption 1

Regarding redactions made pursuant to Exemption 1, Rear Adm. Spedero also reviewed the NGA document for which Exemption 1 redactions were applied. LRS ¶ 112. Rear Adm. Spedero assessed NGA's mission set and purpose; the costs and efforts to build NGA's technological infrastructure; and NGA's dependencies, capabilities, and vulnerabilities. LRS ¶¶ 113-19.

Rear Adm. Spedero reviewed the record and determined, as an OCA, that the NGA national security information redacted in the 11-page document pursuant to FOIA Exemption 1 is properly classified. LRS ¶ 120. Specifically, Rear Adm. Spedero outlined, page by page, that if the information were released, it would cause serious damage to the United States' national security, as it would either 1) enable individual NGA employees to be targeted by foreign intelligence services or adversaries, thus compromising or introducing unacceptable risk to the United States' geospatial intelligence enterprise; 2) reveal the United States' technical capabilities for collection of this imagery, thus enabling the United States' adversaries to exploit limitations in these capabilities and diminishing the strategic intelligence value of this collection means and associated methods; 3) reveal the capabilities of the United States' National Technical Means sensors or platforms, enabling adversaries to exploit possible limitations; or 4) facilitate the loss of the specific intelligence target or otherwise enable the adversary to change

behavior with the effect of mitigating the ability of the United States to collect intelligence on the target. LRS ¶¶ 121-24.

Rear Adm. Spedero credibly asserts in his declaration that all the above-mentioned redacted information is properly classified, and its release could reasonably be expected to harm national security. As such, and for the reasons described in Section IV.B.1.a., this redacted information by NGA is properly classified information and is accordingly exempt from disclosure under Exemption 1; therefore, summary judgment should be granted to Defendant.

**b. Exemptions 3 and 6**

Another relevant statue within FOIA's coverage under Exemption 3 is 10 U.S.C. § 424, *Disclosure of organizational and personnel information: exemption for specified intelligence agencies*. LRS ¶ 126. This statute permits NGA to not disclose the names or personally identifying information of its employees. LRS ¶¶ 126-28.

NGA also has a policy interest served by protecting privacy interest of its employees who, by virtue being part of the intelligence community and have access to highly sensitive and classified national security information. LRS ¶¶ 129-31. That is, these employees may subject to a heightened risk of exploitation of PII by the United States' adversaries, which outweigh any public interest in the information. *Id*.

NGA appropriately considered relevant statutes; weighed public and privacy interests; considered the foreseeable harm standard; and properly redacted portions of the requested information in accordance with FOIA exemptions 3 and 6. *Id.* As such, and for the reasons set forth above in Sections IV.B.1.b., B.1.c., B.2.a., B.2.c, and B.3, summary judgment should be granted to Defendant.

## V.     <u>CONCLUSION</u>

For the reasons stated above, having completed its search for responsive records subject to the FOIA and having released all nonexempt information, the Court should grant summary judgment in Defendant's favor.

Respectfully submitted,

VANESSA ROBERTS AVERY
UNITED STATES ATTORNEY

<u>/s/ J. Brian Meskill</u>
J. Brian Meskill (ct29611)
Assistant United States Attorney
450 Main St., Suite. 328
Hartford, CT 06103
Tel: (860) 760-7966
Fax: (203) 779-5373
Email: <u>Brian.Meskill@usdoj.gov</u>