**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| CONNECTICUT VETERANS LEGAL CENTER and STRONGHOLD FREEDOM FOUNDATION, | ) ) ) | CASE NO. 3:23-CV-408 (KAD) |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | APRIL 2, 2026 |
| | ) | |
| DEPARTMENT OF DEFENSE, | ) | |
| *Defendant*. | | |

<u>**MEMORANDUM OF DECISION**</u>
**RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 42) and**
**PLAINTIFFS' CROSS-MOTION UNDER RULE 56(d) (ECF NO. 49)**

Kari A. Dooley, United States District Judge:

Plaintiffs Connecticut Veterans Legal Center ("CVLC") and Stronghold Freedom Foundation ("SFF," and together, "Plaintiffs") bring this action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, against the Department of Defense ("DOD" or "Defendant"). Plaintiffs seek the disclosure of documents related to U.S. military veterans' exposure to toxic chemicals at Karshi-Khanabad Air Base ("Karshi-Khanabad" or "K2") in Uzbekistan during the war in Afghanistan. Having submitted FOIA requests to multiple DOD subcomponent agencies, Plaintiffs filed this action challenging the adequacy of the DOD's search for responsive documents, as well as the withholdings and redactions that the DOD applied to certain documents that were produced. Defendant has moved for summary judgment with respect to (1) the adequacy of the subcomponent agencies' searches; and (2) the propriety of the withholding of certain records and portions of records. Plaintiffs oppose the motion for summary judgment and cross-move under Fed. R. Civ. P. 56(d) for the Court to defer adjudication and permit additional, limited discovery. For the reasons that follow, Defendant's motion is GRANTED in part and DENIED in part, and Plaintiffs' cross-motion is GRANTED in part.

## I.    Factual Background and Procedural History

The relevant facts are taken from Defendant's Local Rule 56(a)(1) Statement, Def.'s SMF, ECF No. 42-2; from Plaintiffs' Local Rule 56(a)(2) Counterstatement and Statement of Additional Material Facts, Pls.' SMF, ECF No. 50-1; from the allegations in the Complaint, ECF No. 1; and from the parties' declarations, affidavits, and other exhibits, *see generally* ECF Nos. 42, 50.  All of the facts set forth herein are undisputed unless otherwise indicated.  Further, the Court "resolves disputed facts in favor of the plaintiff where there is evidence to support [their] allegations."  *El Badrawi v. Dep't of Homeland Sec.*, 583 F. Supp. 2d 285, 293 n.1 (D. Conn. 2008), *abrogated on other grounds by Spadaro v. U.S. Customs & Border Prot.*, 978 F.3d 34 (2d Cir. 2020).

The CVLC is a nonprofit organization based in Connecticut that assists veterans to overcome legal obstacles in housing, healthcare, and finances.  Def.'s SMF ¶ 1.  The SFF is also a nonprofit organization based in Arizona that was founded to address health concerns by veterans who were deployed at Karshi-Khanabad during the war in Afghanistan.  *Id.* ¶ 2.

### a.    Karshi-Khanabad Air Base

In the aftermath of the terrorist attacks on September 11, 2001, the United States deployed thousands of active-duty members of the U.S. military to Karshi-Khanabad Air Base in Uzbekistan.  Compl. ¶ 1.  Karshi-Khanabad Air Base, otherwise known as "K2," is a former Soviet air base in southeastern Uzbekistan which had been primarily used during the Soviet-Afghan War in the 1990s.  *Id.* ¶¶ 16, 21.  During the Soviet-Afghan War, the Soviet army is alleged to have kept and later disposed of a variety of toxic chemicals at K2, including aviation maintenance solvents, jet fuel, nerve agents, and partially enriched yellowcake uranium.  *Id.* ¶¶ 17, 19–22.  These toxic substances were believed to have seeped into and contaminated the earth, water, and base infrastructure at K2.  *Id.* ¶¶ 18–21.  After the Soviet army withdrew from Afghanistan and

Uzbekistan in 1992, the newly independent state of Uzbekistan took control of K2, after which, the U.S. military established a presence there. *See id.* ¶¶ 21–23.

The U.S. military identified K2 as the staging ground for the initial ground invasion into Afghanistan because it was close to the border between Uzbekistan and Afghanistan. *See id.* ¶ 2; Pls.' SMF ¶ 134. U.S. Armed Forces arrived at K2 in October 2001, and they began to rebuild and reconstruct the base into "Camp Stronghold Freedom." *See* Compl. ¶¶ 2, 24; Pls.' SMF ¶ 135. As part of the rebuilding effort, U.S. servicemembers dug out trenches and berms to protect against sporadic attacks, allegedly exposing them to the toxic chemicals in the ground and water. Compl. ¶¶ 27–28; Pls.' SMF ¶ 135. Military personnel who dug the trenches and manned the berms "displayed severe symptoms of toxic exposure, including headaches, nausea, and loss of consciousness." Pls.' SMF ¶ 137. These symptoms were also observed in servicemembers who were stationed at K2 but did not have a role in constructing the trenches or berms. *See* Compl. ¶ 29; *see also* Peters Decl., ECF No. 50-6, ¶¶ 16, 19–20.[1]

Approximately two weeks after servicemembers arrived at K2, the CHPPM, sometimes also called the U.S. Army CHPPM or USACHPPM,[2] arrived at K2 and conducted an environmental survey. Peters Decl. ¶¶ 20, 22–23. The CHPPM conducted a survey over the span of a week and identified several toxic chemicals present at K2, including asbestos, organophosphate nerve agents, and radioactive uranium. Pls.' SMF ¶ 138. The servicemembers

---

[1] Much of the testimony about the initial medical symptoms of servicemembers and the results of the subsequent environmental survey comes from the affidavit of Dr. Gordon Peters, M.D., M.P.H., who was the Joint Special Operations Task Force Surgeon for the units deployed to K2. *See* Peters Decl. ¶¶ 8–9. After beginning to observe servicemembers' symptoms, Dr. Peters requested expedited arrival of the Center for Health Promotion and Preventive Maintenance ("CHPPM" or "USACHPPM") to K2, and he worked closely with the CHPPM surveyors while they conducted their tests. *Id.* ¶¶ 20–23.

[2] The USACHPPM was a predecessor to the Defense Centers for Public Health—Aberdeen ("DCPH-A"), a subcomponent of the U.S. Army Medical Command and one of the subcomponent agencies to which Plaintiffs sent FOIA requests. *See infra* at p. 5.

at K2 were not briefed about the details of the toxic chemicals present at K2, either before or after arriving.  Peters Decl. ¶¶ 10, 41.  All told, between 2001 and 2005, at least 15,777 U.S. troops served at K2.  Pls.' SMF ¶ 139.

Plaintiffs allege that, since the end of operations at K2 in 2005, "K2 veterans are assessed to contract specific cancers at rates multiple times that of other demographic groups," and that "[m]any K2 veterans who were otherwise healthy succumbed to rare diseases early in their lives." *Id.* ¶ 140.  SFF was founded in 2020 to advocate for K2 veterans and their access to healthcare. *Id.* ¶ 142; Def.'s SMF ¶ 2.

In December 2019, the news bureau McClatchy published an article about toxic chemicals at K2, which included allegedly leaked classified documents (hereinafter referred to as the "McClatchy Article").  *See* Browning Decl., ECF No. 50-2, ¶ 23; Ex. G to Pls.' Opp'n ("McClatchy Article"), ECF No. 50-13; Compl. ¶¶ 58–59.  And in July 2020, the House Committee on Oversight released "a small number of previously classified reports from 2001, 2002, and 2004" related to K2 that were released to Congress by the Defendant.[3]  Compl. ¶ 64.

### b.  Plaintiffs' FOIA Requests and Defendant's Responses

On or around October 11, 2022, Plaintiffs submitted three substantively identical FOIA requests, with multiple parts, to several DOD subcomponent agencies.[4]  Browning Decl. ¶ 13; *see*

---

[3] *See National Security Subcommittee Releases Newly Declassified Documents Revealing How Servicemembers Were Exposed to Multiple Toxic Hazards on Karshi-Khanabad Airbase*, Oversight Democrats Comm. (July 9, 2020), https://oversightdemocrats.house.gov/news/press-releases/national-security-subcommittee-releases-newly-declassified-documents-revealing.

[4] The DOD has at least thirty-four subagencies and subcomponents under its control, Pls.' SMF ¶ 148, only some of which are relevant to this case.  Many of these subcomponent agencies also have their own FOIA departments and programs.  *See Osen LLC v. U.S. Cent. Command*, 969 F.3d 102, 117–18 (2d Cir. 2020) (Menashi, J., concurring) ("In the Department of Defense (DoD) alone, there are nineteen components that have their own FOIA programs, including a FOIA appellate authority, and thirteen additional components that have their own FOIA programs and a consolidated appellate authority." (quotation omitted)); *see also* Ex. D to Pls.' Opp'n ("DOD FOIA Manual"), ECF No. 50-10, at 6–8 (listing DOD subcomponents with separate FOIA offices).

*generally* Ex. A to Pls.' Opp'n ("FOIA Requests"), ECF No. 50-7.  Plaintiffs sent FOIA requests to (1) the Defense Centers for Public Health—Aberdeen ("DCPH-A"),[5] the successor agency to the USACHPPM, *see supra* at n.2; Def.'s SMF ¶ 12; (2) United States Central Command ("CENTCOM"), the combatant command[6] which manages operations in the Middle East, Central Asia, and parts of South Asia, Def.'s SMF ¶¶ 61–63; (3) United States Special Operations Command ("SOCOM"),[7] the unified combatant command that oversees special operations, *id.* ¶¶ 83–84; and (4) the Office of the Secretary of Defense ("OSD").[8]  *See* Browning Decl. ¶ 13. Plaintiffs also sent requests to the DOD Office of the Inspector General ("OIG"), *id.*, but Plaintiffs do not challenge the responses from the OIG.  Def.'s SMF ¶ 27.  In January 2023, Plaintiffs sent a supplemental FOIA request to CENTCOM and OSD, specifically regarding the McClatchy Article.  *Id.* ¶¶ 16–17; Compl. ¶ 88.

Plaintiffs filed the Complaint on April 3, 2023.  ECF No. 1.  Defendant filed an answer on May 19, 2023.  ECF No. 21.  On June 26, 2023, the Court adopted the parties' joint proposed scheduling order which contemplated multiple meet-and-confers and a final records production by

---

[5] The DCPH-A was previously named the Army Public Health Center ("APHC"), and thus, some of Plaintiffs' FOIA requests were directed to the APHC.  Def.'s SMF ¶¶ 28–29.  The DCPH-A primarily produces technical, environmental, and epidemiological reports concerning public health threats to U.S. servicemembers.  *See id.* ¶¶ 30–31.

[6] CENTCOM is one of eleven combatant commands centralized under the DOD.  Def.'s SMF ¶ 61. CENTCOM, along with the other combatant commands, are designated as "headquarter element[s]," meaning that they do not have any military units permanently assigned to them.  *Id.* ¶ 64.  Instead, troops from the Military Services are assigned to different combatant commands for temporary operations.

[7] SOCOM's general mission is to train and equip special operations forces to conduct global special operations, "to support persistent, networked, and distributed combatant command operations and campaigns against state and non-state actors."  Aceituno Decl., ECF No. 42-8, ¶ 6.  "SOCOM's core activities include direct military action, special reconnaissance, countering weapons of mass destruction, counterterrorism, unconventional warfare, foreign internal defense, security force assistance, hostage rescue and recovery, counterinsurgency, foreign humanitarian assistance, military information support operations, civil affairs and other such activities as may be specified by the President or the Secretary of Defense."  Def.'s SMF ¶ 87.

[8] Once Plaintiffs filed this action, agency counsel at the OSD took over processing the FOIA requests to the OSD, as well as coordinating the FOIA responses from the other DOD subcomponent agencies.  Def.'s SMF ¶ 97.

the Defendant.  *See* ECF Nos. 24, 25.  Defendant made its final production of responsive, non-exempt records by December 29, 2023.  *See* ECF No. 35; Def.'s SMF ¶ 24.  On January 29, 2024, the parties filed a joint status report on Defendant's final production, indicating that the parties held six telephonic meet-and-confers between May 26, 2023, and January 29, 2024.  JSR, ECF No. 36, ¶ 4.  Defendant produced numerous documents, and the parties narrowed the items in dispute to 14 subparts of the three FOIA requests.  *See id.* ¶¶ 3, 5.

> Items 1, 3, 4, 5, 6, 8, 9, and 12 of "Re: FOIA Request for Records Underlying APHC Environmental Testing and Assessment Associated with U.S. Servicemembers Deployed in Uzbekistan" requesting *all records, reports, laboratory notes, testing data, draft reports, and correspondence related to the following previously released documents*, also attached as exhibits, and cited documents available in the public domain, including records sufficient to show the methodologies of each test conducted for each document:
> 1. Any copies of the documents published by the online news organization McClatchy alongside their December 20, 2019, article titled "Cancers strike veterans who deployed to Uzbek base where black goo oozed, ponds glowed";
> 3. The November 16, 2001 "Preliminary Industrial Hazards Assessment, Uzbekistan, Operation Enduring Freedom";
> 4."Final Environmental Site Characterization and Operational Health Risk Assessment, Stronghold Freedom, Karshi Khanabad Airfield, Uzbekistan 27 October – 27 November 2001";
> 5. The June 7, 2002 "Memorandum for Record" Subject: "Results of Air Monitoring, Building FOB 192, Camp Stronghold Freedom, Uzbekistan";
> 6. "Final Report Environmental Site Survey and Operational Health Risk Assessment Stronghold Freedom Karshi-Khanabad Airfield Uzbekistan 31 May – 14 June 2002";
> 8. "Final Report Environmental Assessment – Hardened Aircraft Shelters Stronghold Freedom Karshi-Khanabad Airfield Uzbekistan 6 June – 20 July 2002";
> 9. The August 4, 2002 Memorandum, Subject: "Report on Hardened Air Shelters (HAS) 17 Contamination";
> 12. The October 2004 "Final Report, Deployment Occupational and Environmental Health Site Assessment, Karshi-Khanabad Airbase, Karshi, Uzbekistan, 31 August – 11 September";
>
> Items 1, 3, and 5 of "Re: FOIA Request for Records Related to APHC Bioassay, Medical, and Environmental Information for U.S. Servicemembers in Uzbekistan" regarding all records in your possession related to occupational and environmental

health at the Karshi-Khanabad base ("K2"), otherwise known as Camp Stronghold Freedom, in Uzbekistan, including but not limited to:

> 1. Copies of all questionnaires for biostatistical analysis that were collected during the 31 May – 14 June 2002 Environmental Assessment – Hardened Aircraft Shelters at K2, and referenced in 5.b. of that Final Report;
>
> 3. Anonymized copies of all medical logbooks from the period of October 2001 – July 2005 from medical facilities at K2 that document reasons for servicemembers' "sick call" visits;
>
> 5. Records sufficient to show levels of any nuclear or radioactive material detected in soil, water, plant, animal, human, or other mediums at any site within K2 or at any other site located in Uzbekistan;

Items 2, 3, and 6 of ""FOIA Request for USACHPPM Records Related to Public Health Information Associated with U.S. Servicemembers in Uzbekistan" relating to the Karshi-Khanabad base ("K2") in Uzbekistan from September 12, 2001 to present":

> 2. All daily summaries, narrative reports, or other correspondence from USACHPPM staff to K2 leadership or forces stationed at K2, USACHPPM leadership, or any other recipient regarding K2;
>
> 3. All reports submitted by United States military units to United States Central Command that pertain to environmental and occupational health conditions at K2;
>
> 6. Any correspondence from K2 forces to higher levels in the chain of command regarding potential environmental or occupational health issues or toxic exposure concerns.

Def.'s Mem. of Law, ECF No. 42-1, at 10–12; *see* JSR ¶ 5; *see generally* FOIA Requests.

### i. DCPH-A

Plaintiffs originally sent FOIA requests to DCPH-A in August 2022, and after DCPH-A directed them to resubmit the requests electronically, Plaintiffs did so on January 30, 2023. Compl. ¶ 83. In June 2023, DCPH-A coordinated a search of its records pursuant to Plaintiffs' FOIA requests. Def.'s SMF ¶ 32. DCPH-A ultimately produced 150 responsive files, consisting of thousands of pages. *Id.* ¶ 38. Four documents contained redactions pursuant to Exemption 1[9] of FOIA, *id.* ¶ 44, and numerous documents in DCPH-A's production contained redactions pursuant

---

[9] FOIA provides for nine exemptions from the general disclosure requirement, contained in 5 U.S.C. § 552(b). *See infra* at p. 27. The FOIA exemptions under § 552(b) will be referred to by their subpart. For example, the Court will refer to the national security exemption under § 552(b)(1) as "Exemption 1."

to Exemptions 3 and 6, *id.* ¶¶ 39–40.  On August 31, 2023, SOCOM (pursuant to its own FOIA search) referred two documents to DCPH-A for processing,[10] which DCPH-A later produced to Plaintiffs with redactions pursuant to Exemption 6.  *Id.* ¶ 41; Bonsall Decl., ECF No. 42-5, ¶ 39. Similarly, on November 30, 2023, CENTCOM referred several documents to DCPH-A, which DCPH-A also produced to Plaintiffs with Exemption 6 redactions.  Def.'s SMF ¶ 42; Bonsall Decl. ¶ 40.

Debra Bonsall, DCPH-A's FOIA officer, coordinated DCPH-A's search.  Bonsall Decl. ¶ 1.  Ms. Bonsall coordinated with John Kolivosky, an environmental engineer in the Environmental Health Risk Assessment Division of DCPH-A, to search DCPH-A's databases for records.  *Id.* ¶¶ 6–7.  Ms. Bonsall averred that Mr. Kolivosky searched both classified and unclassified storage locations.  For classified information, Mr. Kolivosky searched for hard-copy files in a classified documents safe; searched DCPH-A's internet-based portal through the Secure Internet Protocol Router Network ("SIPR"); and searched DCPH-A's SIPR shared P-Drive.  *Id.* ¶¶ 8–11.  For unclassified information, Mr. Kolivosky searched DCPH-A's unclassified internet-based portal on the Non-Classified Internet Protocol Network ("NIPR"), named the Defense Occupational and Environmental Health Readiness System-Industrial Hygiene ("DOEHRS") library; and searched DCPH-A's NIPR shared P-Drive and S-Drive.  *Id.* ¶¶ 15–16, 21.

Plaintiffs challenge the adequacy of DCPH-A's search and all the redactions it applied pursuant to Exemptions 1, 3, and 6.

### ii.  CENTCOM

Plaintiffs mailed their FOIA requests to CENTCOM on October 11, 2022, but CENTCOM did not issue any response, and on February 24, 2023, the U.S. Postal Service returned the mailed

---

[10] Generally, if an agency subcomponent possesses a responsive document that did not originate with that subcomponent, the document is referred to the originating agency for review and processing.

requests to Plaintiffs' counsel as "unclaimed."  Compl. ¶ 86; Pls.' SMF ¶ 70; Walburn Decl., ECF No. 42-7, ¶ 5.  In January 2023, Plaintiffs sent a supplemental FOIA request to CENTCOM, specifically regarding the McClatchy Article.  Compl. ¶ 88; Ex. C to Compl. ("Suppl. Request"), ECF No. 1-3.  CENTCOM avers that these requests did not reach the FOIA office and that they did not know about the requests until the present action was filed.  Def.'s SMF ¶ 70; Walburn Decl. ¶ 5.  CENTCOM coordinated a search of its records with FOIA counsel from OSD.  *See* Def.'s SMF ¶ 71.  CENTCOM made its final production of responsive records by the December 2023 deadline set by the Court.  Pls.' SMF ¶ 72.  CENTCOM produced 18 pages of documents, with redactions pursuant to Exemptions 3 and 6.  Def.'s SMF ¶ 76.  CENTCOM also withheld 23 pages of documents pursuant to Exemptions 5 and 6, *id.* ¶ 77, the propriety of which Plaintiffs do not challenge here.  Pls.' Opp'n, ECF No. 50, at 32 n.1.  On November 15, 2023, SOCOM (pursuant to its own FOIA search) referred two pages of documents to CENTCOM for processing, which CENTCOM later produced to Plaintiffs with redactions pursuant to Exemptions 3 and 6.  Def.'s SMF ¶ 80.  CENTCOM also identified one 11-page record that fell under the purview of the National Geospatial Intelligence Agency ("NGA"), and thus, CENTCOM referred that record to NGA.  *Id.* ¶ 79.  NGA produced that record to Plaintiffs with redactions pursuant to Exemptions 1, 3, and 6.  *Id.* ¶¶ 111, 125.  Plaintiffs do not challenge the application of Exemptions 3 and 6 to that record, but they do challenge the application of Exemption 1.  Pls.' Opp'n at 32 n.1.

Amanda Walburn, CENTCOM's FOIA officer, coordinated CENTCOM's search with the "USCENTCOM Records Manager and USCENTCOM FOIA Director."  Walburn Decl. ¶¶ 1–2. Ms. Walburn averred that CENTCOM searched the following electronic storage locations: NIPR (for non-classified records); SIPR (for classified records); the Joint Worldwide Intelligence Communications System (JWICS) shared drives; emails; and Content Manager ("CM"), which is

CENTCOM's electronic records management system. *Id.* ¶ 10. Ms. Walburn also averred that CENTCOM searched the following physical storage spaces: "the surgeon's (medical) office space, the public affairs office space (media), and the legal office." *Id.*

Plaintiffs challenge the adequacy of CENTCOM's search and the redactions it applied pursuant to Exemptions 3 and 6. They also challenge the propriety of the redactions the NGA applied to the single document it produced under Exemption 1.

### iii. SOCOM

Plaintiffs mailed their FOIA requests to SOCOM on October 11, 2022. Compl. ¶ 81. SOCOM acknowledged receipt of the requests on October 27, 2022, and they denied that they were in possession of any responsive documents. *Id.* ¶ 85; *see* Def.'s SMF ¶ 81. Plaintiffs dispute SOCOM's assertion that it "does not have an internal program of record to maintain the information requested," and that the requested records "would not be information or records one would expect to be maintained by SOCOM." Def.'s SMF ¶¶ 89–90; Pls.' SMF ¶¶ 89–90. Regardless, SOCOM conducted a search of only the SOCOM Surgeon General's Office's Force Health Protection Section. Def.'s SMF ¶ 90. SOCOM located four records which did not originate from SOCOM, and thus, SOCOM referred processing of those documents to the DOD subcomponents from which they originated. *Id.* ¶ 96. DCPH-A and CENTCOM processed three of these records, *see supra* at pp. 8–9, and a single one-page record was reviewed and processed by the U.S. Army Special Operations Command ("USASOC"), a subcomponent of SOCOM. Def.'s SMF ¶ 107. That one-page document from USASOC was produced to Plaintiffs with redactions pursuant to Exemptions 3 and 6. *Id.* ¶¶ 109–10.

Ryan Aceituno, the chief FOIA officer at SOCOM, coordinated the response to Plaintiffs' FOIA requests. *See* Aceituno Decl. ¶¶ 1, 11. Mr. Aceituno averred that he tasked the SOCOM

10

Surgeon General Subject Matter Expert ("SG SME") with conducting a search of SOCOM's records systems. *Id.* ¶¶ 14–15. He averred that the SG SME searched both classified and unclassified systems, including "personal drives, the SG shared drives, and SG individual emails." *Id.* ¶ 15. The SG SME also searched the SG's Microsoft SharePoint site. Aceituno Suppl. Decl., ECF No. 42-10, ¶ 13. No records were found in the classified system, and four records were found in the unclassified system. Aceituno Decl. ¶¶ 15–16.

Plaintiffs challenge the adequacy of SOCOM's search, including the determination that SOCOM was not likely to possess responsive documents. They also challenge USASOC's application of redactions to the one-page record it produced under Exemptions 3 and 6.

### iv. OSD

Plaintiffs mailed their FOIA requests to OSD on October 11, 2022. Compl. ¶ 81. OSD acknowledged receipt of the requests on October 27, 2022, and they indicated that they had begun processing the requests. *Id.* ¶ 84. In January 2023, Plaintiffs also sent the supplemental FOIA request regarding the McClatchy Article to OSD, *id.* ¶ 88, which OSD added to their processing queue on February 16, 2023. *Id.* ¶ 89. After OSD agency counsel reviewed both the requests directed at OSD and the larger universe of Plaintiffs' DOD requests, it determined that OSD was unlikely to have any non-duplicative documents (which Plaintiffs dispute, Pls.' SMF ¶ 100), but it conducted a search of its records regardless. Def.'s SMF ¶ 100.

Mark Herrington, an Associate Deputy General Counsel in the DOD, is the agency counsel who was assigned to this case and coordinated OSD's records search. Herrington Decl., ECF No. 42-4, ¶¶ 1–2, 7. OSD referred the search to one of its subcomponent offices, the Office of the Assistant Secretary of Defense for Health Affairs ("ASDHA"), which is the "principal advisor to [the Secretary of Defense] for all DoD health and force health protection policies, programs,

11

activities, and the Integrated Disability Evaluation System." Def.'s SMF ¶¶ 101, 103.[11]  ASDHA

confirmed that it did possess responsive records, but that those records were duplicative of the

records identified by DCPH-A. *Id.* ¶ 102.

Plaintiffs dispute OSD's assertion that the ASDHA was unlikely to possess responsive or

non-duplicative records. Pls.' SMF ¶ 106. They also dispute the adequacy of OSD's and

ASDHA's search. *Id.*

## II.    Standard of Review

A motion for summary judgment may be granted only where there is no genuine dispute

as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R.

Civ. P. 56(a); *see also Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113–14 (2d

Cir. 2017). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury

could return a verdict for the nonmoving party.'" *Nick's Garage*, 875 F.3d at 113–14 (quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Which facts are material is determined

by the substantive law. *Anderson*, 477 U.S. at 248. "The same standard applies whether summary

judgment is granted on the merits or on an affirmative defense . . . ." *Giordano v. Mkt. Am., Inc.*,

599 F.3d 87, 93 (2d Cir. 2010). In considering a motion for summary judgment, a court "must

construe the facts in the light most favorable to the non-moving party and must resolve all

ambiguities and draw all reasonable inferences against the movant." *Kee v. City of New York*, 12

F.4th 150, 158 (2d Cir. 2021) (citation and internal quotation marks omitted).

The moving party bears the initial burden of informing the court of the basis for its motion

and identifying the admissible evidence it believes demonstrates the absence of a genuine issue of

---

[11] Furthermore, "ASDHA's focus is high-level policy based upon factual input from subordinate components, such as DHA or DCPH-A, to advise [the Secretary of Defense] or reply to inquiries from the Press or Congress." Herrington Decl. ¶ 8.

material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must set forth "specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). He cannot "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 44 (2d Cir. 2015) (quotation marks and citation omitted). Nor can he rely on "mere speculation or conjecture as to the true nature of the facts." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quotation omitted). To defeat a motion for summary judgment, the nonmoving party must present such evidence as would allow a jury to find in his favor. *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

## III.    Discussion

"FOIA was enacted to promote honest and open government, and to ensure public access to information created by the government in order to hold the governors accountable to the governed." *Long v. Off. of Pers. Mgmt.*, 692 F.3d 185, 190 (2d Cir. 2012) (internal citation and quotation marks omitted). Thus, "FOIA provides that federal agencies in possession of records and related materials must make them available to the general public upon request." *Lawyers Comm. for Hum. Rts. v. Immigr. & Naturalization Serv.*, 721 F. Supp. 552, 560 (S.D.N.Y. 1989) (citing 5 U.S.C. § 552(b)(2)–(9)). When an agency receives a request for records, it must "(1) conduct an adequate search using reasonable efforts, (2) provide the information requested, unless it falls within a FOIA exemption, and (3) provide any information that can be reasonably segregated from the exempt information." *N.Y. Times Co. v. U.S. Dep't of Just.*, 390 F. Supp. 3d 499, 511 (S.D.N.Y. 2019) (quotations omitted); *see also Seife v. U.S. Food & Drug Admin.*, 43 F.4th 231, 238 (2d Cir. 2022) ("Summary judgment for the agency in a FOIA case is appropriate when the affidavits describe the justifications for nondisclosure with reasonably specific detail,

13

demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." (quotation omitted)).    The statute "strongly favors a policy of disclosure and requires the government to disclose its records unless its documents fall within one of the specific, enumerated exemptions set forth in the Act." *Nat'l Council of La Raza v. U.S. Dep't of Just.*, 411 F.3d 350, 355 (2d Cir. 2005) (internal citation omitted).

"FOIA embodies 'a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language.'" *Reprod. Rts. & Just. Project v. Dep't of HHS*, 490 F. Supp. 3d 516, 524 (D. Conn. 2020) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 360–61 (1976)).    Thus, agencies "ha[ve] a duty to construe a FOIA request liberally," *Nation Mag., Wash. Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995), and "FOIA exemptions are construed narrowly," *Long*, 692 F.3d at 190.    "[A] court is to resolve all doubts in favor of disclosure." *Id.*[12]

### a.  Adequacy of Agency Searches

Defendant has moved for summary judgment on the adequacy of the searches that each subcomponent agency undertook in responding to Plaintiffs' FOIA requests.    Plaintiffs oppose the motion, arguing primarily that the affidavits and declarations submitted in support of the motion are facially inadequate to support Defendant's claim that they conducted an adequate search.

FOIA provides that, in responding to a request for records, an agency "shall make reasonable efforts to search for" the requested records.    5 U.S.C. § 552(a)(3)(C).    "To prevail on summary judgment when the adequacy of an agency's search is at issue, the defending agency

---

[12] The Second Circuit has noted that the D.C. Circuit is "something of a specialist in adjudicating FOIA cases, given the nature of much of its caseload." *Whitaker v. Dep't of Com.*, 970 F.3d 200, 206 n.25 (2d Cir. 2020) (quotation omitted).    In the absence of guidance from the Second Circuit and other district courts within this Circuit, the Court will therefore look to D.C. Circuit precedent for guidance throughout this decision.

must show beyond material doubt that it has conducted a search reasonably calculated to uncover all relevant documents." *Viet. Veterans of Am. Conn. Greater Hartford Chapter 120 v. Dep't of Homeland Sec.*, 8 F. Supp. 3d 188, 205 (D. Conn. 2014). "Reasonableness does not demand perfection, and a reasonable search need not uncover every document in existence." *Peeler v. U.S. Dep't of Just., Drug Enf't Agency*, No. 11-CV-1261 (JBA), 2013 WL 4441528, at *4 (D. Conn. Aug. 15, 2013) (quotation omitted); *see Media Rsch. Ctr. v. U.S. Dep't of Just.*, 818 F. Supp. 2d 131, 138 (D.D.C. 2011) ("[A]n agency's search is not presumed unreasonable because it fails to find every potentially responsive document."). But it is the agency's burden on summary judgment to show that its search was adequate, and it cannot rely on conclusory or non-specific evidence about the search to do so. *See Eberg v. U.S. Dep't of Def.*, 193 F. Supp. 3d 95, 107 (D. Conn. 2016); *Steinberg v. U.S. Dep't of Just.*, 23 F.3d 548, 551 (D.C. Cir. 1994).

In determining whether an agency conducted an adequate search, an agency may rely on affidavits and declarations describing the search it undertook to meet its burden. *El Badrawi*, 583 F. Supp. 2d at 298. However, "[t]he Second Circuit has adopted the D.C. Circuit position that such reliance is only appropriate . . . when agency affidavits are '. . . relatively detailed and nonconclusory, and submitted in good faith.'" *Id.* (quoting *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 488–89 (2d Cir. 1999)). Thus, a court may only grant summary judgment on the basis of agency affidavits or declarations if they contain "*reasonable specificity* of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." *Grand Cent. P'ship*, 166 F.3d at 478 (emphasis in original) (quoting *Gallant v. NLRB*, 26 F.3d 168, 171 (D.C. Cir. 1994)). Declarations and affidavits submitted by agencies in the FOIA context are presumed to have been made in good faith. *See id.* at 489; *Viet. Veterans*, 8 F. Supp. 3d at 202.

15

When assessing "reasonable specificity," courts have found that affidavits must, for instance, "describe in reasonable detail the scope of the search and the search terms or methods employed." *Serv. Women's Action Network v. Dep't of Def.*, 888 F. Supp. 2d 231, 241 (D. Conn. 2012). And although agencies have discretion in selecting which search terms to use, the terms should be "reasonably tailored to uncover documents responsive to the FOIA request." *Bigwood v. U.S. Dep't of Def.*, 132 F. Supp. 3d 124, 140 (D.D.C. 2015) (quotation omitted). And courts in this Circuit have held that agencies should provide an explanation as to why certain search terms were not used. *Immigrant Def. Project v. U.S. Immigr.*, 208 F. Supp. 3d 520, 528 (S.D.N.Y. 2016) (noting that an agency may provide as an explanation, for instance, "the futility of the term to narrow the field of documents or an office's failure to use the term in question in its records or recordkeeping"). In addition, "[a]ffidavits should identify the searched files and describe at least generally the structure of the agency's file system which renders any further search unlikely to disclose additional relevant information." *El Badrawi*, 583 F. Supp. 2d at 298 (quotation omitted).

"If agency affidavits fail to meet standards, a 'district court will have a number of options for eliciting further detail from the government. It may require supplemental . . . affidavits or may permit [the requester] further discovery.'" *Viet. Veterans*, 8 F. Supp. 3d at 206 (quoting *Halpern v. FBI*, 181 F.3d 279, 295 (2d Cir. 1999)). "When the courts have permitted discovery in FOIA cases, it is generally limited to the scope of the agency's search." *El Badrawi*, 583 F. Supp. 2d at 301.

"Finally, it bears noting that, even if an agency has met its burden by submitting, in good faith, relatively detailed and nonconclusory affidavits, 'the requester may nonetheless produce countervailing evidence, and if the sufficiency of the agency's identification or retrieval procedure

16

is genuinely in issue, summary judgment is not in order.'"  *Id.* at 299 (quoting *Morley v. CIA*, 508 F.3d 1108, 1116 (D.C. Cir. 2007)).

Plaintiffs challenge the adequacy of Defendant's affidavits as lacking sufficient specificity regarding: the file-keeping systems generally; the methods used to search systems; the failure to search all available systems or to explain the reason certain systems were not searched; and the failure to cross-reference the requests to other DOD subcomponents.  Pls.' Opp'n at 9–10.[13]

### i.  DCPH-A

Defendant submitted the affidavit of Debra Bonsall, the FOIA/Privacy Act officer with DCPH-A.  Bonsall Decl. ¶ 1.  As such, she was responsible for overseeing the FOIA response from DCPH-A.  *Id.* ¶ 2.  Affiant Bonsall, working closely with technical expert John Kolivosky, conducted the search of all classified and non-classified systems.  *Id.* ¶¶ 6–7.  The search of classified information included: (1) a search for hard copies in a classified document safe; (2) a search of the "Internet-based portal"; and (3) a search of the "P Drive."  The search for non-classified records included: (1) a search of the "Internet-based portals" and (2) the network drives—the P drive and the S drive.  *See id.* ¶¶ 8–34.  And although DCPH-A's affidavit contains a fair amount of detail, it leaves several questions unanswered.[14]

---

[13] Because neither Defendant nor Plaintiffs moved for summary judgment on Plaintiffs' policy and practice claim, *see* Compl. ¶ 102, the Court does not take up that claim here.

[14] Defendant relies upon *Bigwood v. U.S. Department of Defense* for the proposition that the affidavits offered to establish the adequacy of the search need only indicate "what records were searched, by whom, and in what manner."  132 F. Supp. 3d at 142.  Although this language appears in the opinion, *Bigwood* itself belies that it stands for this overly simplistic assessment of the Defendant's obligations.  There, the plaintiff, an investigative journalist, was seeking records from the DOD relating to a coup against Honduras' president Manuel Zelaya, as well as records relating to a Honduran army general Romeo Vasquez Velasquez.  The district court decision, which adopted a recommended ruling from a Magistrate Judge, contains a detailed and painstaking analysis of the DOD affidavits and the efforts undertaken by DOD to find responsive documents.  After the FOIA requests were received, based upon conversations with the plaintiff, DOD searched systems using seventeen (17) different search terms.  The DOD identified six (6) subcomponents as likely to contain responsive records and identified each.  *See id.* at 137–38.  The affidavit then detailed the reasons behind the deliberate selection of the six subcomponents.  DOD then "directed personnel within these six subcomponents to 'conduct manual searches of their paper files, as well as electronic searches of their desktops, hard drives, shared drives, storage data bases, and Microsoft Outlook email files' using the

For example, DCPH-A searched the classified P-Drive and the unclassified document library (called the DOEHRS library). The search terms it used for searching the classified P-Drive were "Uzbekistan," "K2," "Karshi-Khanabad," "Stronghold Freedom," and "CHPPM-EUR." *Id.* ¶ 14. The search terms used for the DOEHRS library were "K2," "Karshi" (to find all the various spellings for Karshi-Khanabad), and "Stronghold Freedom." *Id.* ¶ 19. The affidavit does not explain why "Karshi" was not a search term for the classified P Drive, if including it was viewed as likely to identify more documents in light of the "various spellings for Karshi-Khanabad." *See id.* Although "there is no requirement that an agency use identical search terms in all of its offices," the agency must offer some explanation for why its search terms varied. *Fox News Network, LLC v. U.S. Dep't of the Treasury*, 739 F. Supp. 2d 515, 534 (S.D.N.Y. 2010); *see Immigrant Def. Project*, 208 F. Supp. 3d at 529 ("Defendants' use of varied search terms does not *per se* undermine the adequacy of the search, so long as Defendants offer an account of its search strategy in each location." (emphasis in original)).

For its search of the SIPR P-Drive, DCPH-A also did not indicate why it used the search term "CHPPM-EUR" instead of (or in addition to) USACHPPM or CHPPM.[15] *See The Few, the*

---

identified search terms." *Id.* at 138. The affidavit further revealed that DOD had sent a contract worker to Honduras to assist in the search. After records were disclosed, the plaintiff expressed concern as to whether additional records existed but were not included. Although DOD maintained that its search procedures were adequate, it agreed to undertake a second search for records. The DOD affidavit revealed which search terms were used; which subcomponents were directed to conduct searches; and the parameters of the search to be conducted similar to the earlier search. In addition, the affidavit revealed that three of the subcomponents were given highly specific directives in an effort to locate potentially responsive documents. For example, the Intelligence Directorate subcomponent was instructed to search "the daily intelligence summaries that referenced the 2009 coup from May, 2009 to the present and to search all records that referenced General Vasquez regardless of the timeframe." *Id.* at 139. The *Bigwood* court concluded that the affidavit was sufficiently detailed to establish that the search was adequate. *Id.*

[15] Plaintiffs also argue that there are several other clearly relevant search terms that Defendant's subcomponent agencies failed to use in their searches: "Defendant failed to search for publicly known references to K2, its environmental hazards, and the units that operated there. For instance, in the records released to Congress and produced via this litigation, the base and its units are referred to as FOB 201 and FOB 192. The base was also commonly referred to as 'Lake Uzbek,' its various toxic features such as the glowing green ponds were known as 'skittles,' and the jet fuel in the soil was called 'black goo.'" Pls.' Opp'n at 23 (internal citations omitted). Defendant may have a reason for not using these terms, or it may not, but either way, it must provide some rationale for using some search terms and not others. *See Knight First Amend. Inst. at Columbia Univ. v. Ctrs. for Disease Control &*

*Proud, the Forgotten v. U.S. Dep't of Veterans Affs.*, 254 F. Supp. 3d 341, 356 (D. Conn. 2017) ("Ms. Brown's declarations do not explain why VBA excluded the term 'Subject Matter Expert' when searching for responses to a FOIA request concerning the Subject Matter Expert program."). Once again, "[a] failure to use certain search terms, including those emphasized by Plaintiff, is not automatically unreasonable, 'so long as the agency provided an explanation as to why the search term was not used.'" *Knight First Amend. Inst.*, 560 F. Supp. 3d at 823 (quoting *Immigrant Def. Project*, 208 F. Supp. 3d at 528). Considering that Plaintiff's FOIA Requests specifically sought "any and all United States Army Center for Health Promotion and Preventative Medicine (USACHPPM) records," *see* FOIA Requests at 1, and DCPH-A provided no reason for why CHPPM-EUR was used instead of "USACHPPM" or "CHPPM," the Court cannot conclude that the search was reasonably calculated to find all responsive records. *See Brennan Ctr. for Just. at N.Y. Univ. v. U.S. Immigr. & Customs Enf't*, 571 F. Supp. 3d 237, 246 (S.D.N.Y. 2021) (finding search was inadequate "where [agency's] affidavits fail to provide any rationale for either the failure to use clearly relevant search terms or the substantial differences between the terms used by different divisions").

Additionally, DCPH-A indicated that it searched six electronic locations, and it only included search terms for two locations: the classified P-Drive and the unclassified DOEHRS Document Library (as explained above). For the remaining electronic locations—the classified internet-based portal search of the "MESL Archive,"[16] the unclassified S-Drive, the unclassified

---

*Prevention*, 560 F. Supp. 3d 810, 823 (S.D.N.Y. 2021) ("[A]n agency must search for synonyms or common variants of a term used in the request that are likely to be used in responsive documents, unless it can reasonably justify declining to use them.").

[16] The SIPR Military Exposure Surveillance Library ("MESL") was an internet-based portal used by DCPH-A throughout the mid-2010s. Bonsall Decl. ¶ 10. The MESL transitioned to a Microsoft SharePoint application in 2018. *Id.* In 2021, all SharePoint applications ended, and the entire MESL was moved to a folder in the classified SIPR P-Drive and relabeled the "MESL Archive," which is "still accessible and searchable." *Id.* Although it appears

P-Drive,[17] and the email archive—no search terms are provided at all. "[W]hile a federal agency has discretion to craft terms it believes are reasonably tailored to uncover documents responsive to a FOIA request, a court *must* be provided with the search terms so that it can evaluate the adequacy of defendant's search." *Robert F. Kennedy Hum. Rts. v. U.S. Immigr. & Customs Enf't*, No. 22-CV-929 (LJV) (HKS), 2024 WL 1704638, at *3 (W.D.N.Y. Apr. 19, 2024) (emphasis added) (citing *Roseberry-Andrews v. Dep't of Homeland Sec.*, 299 F. Supp. 3d 9, 24 (D.D.C. 2018)). Without knowing the parameters of the search that DCPH-A conducted, the Court cannot meaningfully evaluate whether the search was adequate.

Lastly, DCPH-A indicated that Mr. Kolivosky also searched "his electronic mail archives" for responsive documents, separate and apart from other electronic locations. Bonsall Decl. ¶ 20. Mr. Kolivosky "archives messages based on the country and specific location," and thus, searched the subfolder named "K2" under "Uzbekistan."[18] *Id.* DCPH-A states that Mr. Kolivosky searched all messages with an attached document, and two responsive items were provided. *Id.* However, DCPH-A does not explain the scope or content of the email archives that were searched: *i.e.*, whether Mr. Kolivosky is the archivist for all DCPH-A emails or if "his" email archive is more limited. *See Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 514 (D.C. Cir. 2011) ("Nowhere does State explain whether it possesses email archives for Bureau employees

---

that the MESL Archive was likely searched as part of the search of the classified P Drive, the affidavit is unclear on this point.

[17] For the unclassified P-Drive, DCPH-A identified and searched four folders because "those are the only folders which may contain responsive documents": (1) OEF; (2) CENTCOM; (3) Special Studies; and (4) CHPPM-EUR. Bonsall Decl. ¶ 23. DCPH-A did not provide the search terms that were used for these folders. *See id.* ¶¶ 25–34. But to account for possible misfiled documents within the P-Drive, DCPH-A searched the entire P/DHRM folder structure with the search terms "K2" and "Karshi," which did not produce any responsive documents. *Id.* ¶ 24.

[18] DCPH-A does not state whether any search terms were used during this search or if Mr. Kolivosky simply reviewed all the emails in his "K2" subfolder. This is also problematic, for all the reasons explained above. *See Fams. for Freedom v. U.S. Customs & Border Prot.*, 837 F. Supp. 2d 331, 334–35 (S.D.N.Y. 2011) (finding, *inter alia*, agency's search of email archives inadequate).

other than the former staff member, whether there are backup tapes containing staff member emails and, if so, whether such backup tapes might contain emails no longer preserved on staff members' computers.").

"Denying the agency's motion for summary judgment is appropriate where a plaintiff raises 'tangible evidence' that the agency's search was incomplete." *Brennan Ctr.*, 571 F. Supp. 3d at 245 (quoting *Carney v. U.S. Dep't of Just.*, 19 F.3d 807, 812 (2d Cir. 1994)). Because DCPH-A has not met its burden of proving that it conducted an adequate search under FOIA, Defendant's Motion for Summary Judgment is DENIED as to the adequacy of DCPH-A's search. Accordingly, the Court finds that Plaintiffs are entitled to further limited discovery as to the adequacy of this search. Specifically, Plaintiffs may depose Ms. Bonsall and Mr. Kolivosky as to the adequacy of their search of DCPH-A records.

### ii. CENTCOM

CENTCOM submitted an affidavit by Amanda Walburn, Chief of Government Information Practices and Litigation at CENTCOM. Walburn Decl. ¶ 1. She was responsible for coordinating the necessary searches with the Records Manager and the FOIA Director. *Id.* ¶ 2. The affidavit is insufficient to establish the adequacy of the CENTCOM search.

First, the affidavit states that electronic locations "were searched," to include in: NIPR (for non-classified records); SIPR (for classified records); the Joint Worldwide Intelligence Communications System (JWICS) shared drives; emails; and Content Manager ("CM"), which is CENTCOM's electronic records management system. *Id.* ¶ 10. CENTCOM also searched three physical storage spaces: the surgeon's medical office, the public affairs office, and legal office. *Id.* However, CENTCOM only describes its search of the CM system in any detail at all. CENTCOM indicates that the searches were conducted in CM "as this is the location responsive

records during the time requested would most likely be if responsive records existed." *Id.* ¶ 11. Read in context, it becomes unclear whether the other electronic locations were, in fact, searched. And if they were searched, CENTCOM's affidavit is silent as to how the NIPR, SIPR, or JWICS drives, or emails were searched, the nature of those systems, whether and what search terms were used, and why or why not. The Court concludes that CENTCOM has not described its search for documents with reasonably specificity, and the Court is therefore unable to determine, on this record, whether the search conducted by CENTCOM was adequate. *E.g.*, *Morley*, 508 F.3d at 1121 (finding that agency failed to describe search adequately where agency "provide[d] little more than conclusory adjectives and does not provide sufficient detail for the court itself to determine the search's adequacy"); *accord The Few, the Proud, the Forgotten*, 254 F. Supp. 3d at 355.

The only search that CENTCOM does describe in any detail is that of the CM system, which is CENTCOM's "electronic records management application/system containing over ninety (90) million war records, including those retrieved from subordinate units serving in the USCENTCOM Area of Responsibility (AOR)." Walburn Decl. ¶ 11. CENTCOM describes how it receives quarterly (or as needed) collections of records from their subcomponent armed forces units (the Combined Joint Task Forces (CJTF)), and those collections are processed and transferred to the CM system for preservation. *Id.* CENTCOM searched the CM system using the following search terms: "Karshi-Khanabad," "K2," "Uzbekistan," "United States Army Center for Health Promotion and Preventative Medicine," "USACHPPM," and "Cancer." *Id.* CENTCOM also used more general search criteria, as well as a date range of September 12, 2001, through April 4, 2023. *See id.* As discussed above for DCPH-A's search, *see supra* at pp. 18–20, CENTCOM does not explain why it used these search terms and not others, including those requested by Plaintiffs. *See*

22

*supra* at pp. 18–20; *see also Knight First Amend. Inst.*, 560 F. Supp. 3d at 823. Although the Court disagrees with Plaintiffs as to the level of minutia required in affidavits in support of summary judgment, for these reasons, CENTCOM has also failed to describe its search of the CM system with reasonable specificity.[19]

In sum, because CENTCOM has not met its burden of proving that it conducted an adequate search under FOIA, Defendant's Motion for Summary Judgment is DENIED as to the adequacy of CENTCOM's search.[20] Accordingly, the Court finds that Plaintiffs are entitled to further limited discovery as to the adequacy of this search. Specifically, Plaintiffs may depose Ms. Walburn as to the adequacy of her search of CENTCOM's records.

### iii. SOCOM

In response to Plaintiffs' FOIA Requests, SOCOM initially determined that the requested information are the types of records that "would not reasonably be maintained by USSOCOM." Aceituno Suppl. Decl. ¶ 9. However, SOCOM nevertheless directed the Surgeon General's office to search for potentially responsive records. *Id.* ¶ 11. Plaintiffs' challenge to the adequacy of SOCOM's search is twofold: first, Plaintiffs challenge SOCOM's determination that they were not

---

[19] Plaintiffs decry the failure of Defendant to specify the precise structure of folders and sub-folders subject to search; the nature of the software used to conduct the search; the capabilities of the software to conduct searches of specific terms; and how the software combined the specific search terms and the general search criteria identified. This level of technological detail is simply not required. *See, e.g.*, *Bigwood*, 132 F. Supp. 3d at 142.

[20] Plaintiffs also take issue with CENTCOM's (and other DOD subcomponents') refusal to refer certain FOIA requests to other DOD subcomponents. The Court cannot, on the present record, determine whether it was reasonable for CENTCOM not to refer the FOIA request to the Military Services, where, it appears, additional SITREPs may be located. "Agencies are 'obliged to pursue any clear and certain lead' that may relate to the subject of a FOIA request." *Immigrant Def. Project*, 208 F. Supp. 3d at 530 (quoting *Halpern*, 181 F.3d at 288–89). However, "an agency's hesitancy to pursue potential leads after its search has been completed, does not lead to the conclusion that the agency's search was inadequate." *Id.* (quotation omitted). Here, CENTCOM does not explain the reason it did not refer Plaintiffs' FOIA requests to the Military Services. CENTCOM may very well have determined that the referral was unduly burdensome, or decided that the potential lead was too speculative, or it was otherwise following DOD FOIA policy, *see generally* DOD FOIA Manual, but because CENTCOM does not provide a rationale for not pursuing this lead, the Court cannot determine whether it was reasonable for them to do so. *See Viet. Veterans*, 8 F. Supp. 3d at 211. *Contra Watkins L. & Advoc., PLLC v. U.S. Dep't of Just.*, 78 F.4th 436, 449 (D.C. Cir. 2023).

likely to possess responsive records, and second, Plaintiffs challenge the adequacy of SOCOM's search of the Surgeon General's office that they eventually conducted.  Plaintiffs' challenge to SOCOM's initial determination is, for all purposes, moot, because SOCOM ultimately *did* conduct a search of its records.  *Cf. Watkins L.*, 78 F.4th at 443 (only addressing the adequacy of the FBI's search where the FBI "thought it unlikely that a search of the Central Records System would identify responsive documents," but "the FBI nonetheless conducted the search in an abundance of caution" (internal quotation omitted)); *id.* at 444 ("[W]e do not fault the FBI for searching a record system in which records were unlikely to be found when it also conducted additional searches that were more likely to elicit responsive records." (internal quotations omitted)).  Thus, the only issue for the Court to analyze is whether SOCOM described the search it did conduct with reasonable specificity, such that the Court can determine whether it was adequate.

In this vein, SOCOM averred that it only searched the Surgeon General's (SG's) office for records, and because all paper records were shredded, it only searched electronic locations.  *See* Aceituno Suppl. Decl. ¶¶ 11–12.  However, the nature and scope of the search remain unclear.  Mr. Aceituno's first affidavit, ECF No. 42-8, indicates that the SG SME conducted a search of "both the classified and unclassified systems which included individual personal drives, the SG shared drives, and SG individual emails."  Aceituno Decl. ¶ 15.  He also provides the search terms that SOCOM used: "K2," "Uzbekistan," "Karshi," "Karshi Khanabad Airfield," and "Camp Stronghold Freedom."  *Id.*  But Mr. Aceituno does not explain the file structure of the SG shared drives, or whether all or just some of the personal drives and emails were searched, and why.

In Mr. Aceituno's supplemental declaration, he avers that SOCOM only searched two electronic locations: the "USSOCOM Portal," and the SG's Microsoft SharePoint site.  Aceituno Suppl. Decl. ¶ 13.  It is unclear, however, whether the "SG shared drives," "individual personal

drives" and "SG individual emails" identified in the first declaration are the same or different from the SG's SharePoint site or the USSOCOM Portal. And although Mr. Aceituno provided search terms in his first affidavit, he does not indicate whether the SharePoint site or Portal were searched with these same keywords, or if different terms were used. *See Immigrant Def. Project*, 208 F. Supp. 3d at 529 ("Defendants' use of varied search terms does not *per se* undermine the adequacy of the search, so long as Defendants offer an account of its search strategy in each location.").

The Court therefore concludes that SOCOM has not described the search that it conducted with reasonable specificity, and it therefore has not met its burden of proving that it conducted an adequate search. Thus, Defendant's Motion for Summary Judgment is DENIED as to the adequacy of SOCOM's search. Given the limited nature of the Court's concerns, the Defendant may submit a clarifying affidavit from Mr. Aceituno regarding the nature and scope of the search; the locations searched; and the search terms used, and why.

### iv.   OSD

Similarly to SOCOM, in response to Plaintiffs' FOIA Requests, OSD initially determined that their records were likely to be completely duplicative of the records possessed by DCPH-A, and thus, a search would likely not produce any non-duplicative, responsive records. Herrington Decl. ¶ 7. This is because OSD primarily advises the Secretary of Defense on high-level policy, based on factual input from subordinate subcomponents, and thus, it is unlikely for them to possess the underlying data or documents. *See* Def.'s SMF ¶¶ 103–05. *But see* Pls.' SMF ¶ 105. But, as was the case for SOCOM, OSD nevertheless conducted a search of their records out of an abundance of caution. Def.'s SMF ¶ 100. OSD's counsel, Mr. Herrington, identified the Office of the Assistant Secretary of Defense for Health Affairs (ASDHA) as the office within OSD that

"has cognizance over the subject of K2 environmental and occupational health concerns," and referred Plaintiffs' FOIA requests to them to conduct a search. *See* Herrington Decl. ¶ 7. ASDHA verified to Mr. Herrington that the only records they located were duplicative of records produced to Plaintiffs by DCPH-A or publicly provided to Congress. *Id.* ¶ 8.

As with SOCOM, Plaintiffs' challenge to OSD's initial determination that a search would be futile is moot because OSD ultimately conducted a search. *See supra* at p. 24. Thus, the Court must determine whether OSD described its search with reasonable specificity—it has not. Preliminarily, the Court concludes, Plaintiffs' argument notwithstanding, that it was appropriate for OSD to narrow its search to those records possessed by ASDHA, which is the subcomponent likely to have possessed responsive records, based on Mr. Herrington's experience with OSD FOIA policies. *See Stein v. CIA*, 454 F. Supp. 3d 1, 23–24 (D.D.C. 2020) ("Herrington's stated familiarity with DMDC databases and with the DMDC official's conclusion provides enough indicia of reliability to provide a sufficient explanation for not searching JPAS."). But ASDHA does not describe the search it conducted at all. Mr. Herrington only indicates that he contacted someone at ASDHA, and that they verified in some way that "[t]he only records [ASDHA located] were copies of DCPH-A K2 environmental and occupational health assessments, which were provided to Congress and not responsive to the requests and/or were included in the set of records provided to Plaintiff by DCPH-A."[21]  Herrington Decl. ¶ 8. ASDHA does not describe its file system; the types of files searched; the method of searching, *i.e.*, through the use of specific terms or broader parameters; or how the determination was made that the identified records were

---

[21] Plaintiffs also take issue with OSD not producing the duplicative documents that ASDHA identified in its search. Pls.' Opp'n at 17. However, Plaintiffs cite no authority to support their argument that they would be entitled to a production of duplicative records. *See Conti v. U.S. Dep't of Homeland Sec.*, No. 12-CV-5827 (AT), 2014 WL 1274517, at *27 (S.D.N.Y. Mar. 24, 2014) (noting that because a requester "is not entitled to documents outside the scope of his request," "it appears that [p]laintiff is not entitled to duplicative documents either") (collecting cases).

duplicative.  Thus, the affidavit from OSD lacks the reasonable specificity necessary to determine the adequacy of the search.

Accordingly, OSD has not met its burden of proving that it conducted an adequate search under FOIA.  Defendant's Motion for Summary Judgment is DENIED as to the adequacy of OSD's search.   Defendant may submit additional, supplemental affidavits describing, in detail and consistent with this decision, ASDHA's search.

### b.  Exemptions

FOIA provides for nine exemptions from the general disclosure requirement, "in recognition of those interests that may at times conflict with the policy of full disclosure." *Reprod. Rts. & Just. Project*, 490 F. Supp. 3d at 524–25 (quotation omitted); *see* 5 U.S.C. § 552(b).  As relevant here, FOIA exempts from public disclosure records that are

> (1) (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order; . . .
> (3) specifically exempted from disclosure by statute . . .
> (6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy . . . .

5 U.S.C. § 552(b).  "These exemptions are explicitly made exclusive, and must be narrowly construed."  *Ctr. for Effective Gov't v. Dep't of State*, 7 F. Supp. 3d 16, 22 (D.D.C. 2013) (quotations and citations omitted).  An agency's withholdings are reviewed *de novo*.  *See* 5 U.S.C. § 552(a)(4)(B).

"The government bears the burden of showing that a requested record falls within one or more of the FOIA exemptions."  *Council on Am.-Islamic Relations–Conn. v. U.S. Citizenship & Immigr. Servs.*, 669 F. Supp. 3d 64, 75 (D. Conn. 2023) (citing 5 U.S.C. § 552(a)(4)(B)).  "[W]hen

an agency seeks to withhold information, it must provide a relatively detailed justification,[22] specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply." *Morley*, 508 F.3d at 1122 (internal quotations omitted).; *see also Carney*, 19 F.3d at 812 ("Affidavits or declarations . . . giving reasonably detailed explanations why any withheld documents fall within an exemption are sufficient to sustain the agency's burden."). "[A]n agency may invoke a FOIA exemption if its justification appears logical or plausible." *ACLU v. Dep't of Just.*, 681 F.3d 61, 69 (2d Cir. 2012) (quotation omitted).

In sum, when ruling on a motion for summary judgment on an agency's FOIA exemptions, a court must ask two questions: "1) have the agencies provided sufficient detail and explanation for their withholdings so that the plaintiff and the court can evaluate the propriety of the application of the exemptions invoked?; and if so, 2) have the agencies properly applied the exemptions in question?" *El Badrawi*, 583 F. Supp. 2d at 310. And "all doubts as to the applicability of an exemption must be resolved in favor of disclosure." *Council on Am.-Islamic Relations*, 669 F. Supp. 3d at 76.

Defendant moved for summary judgment on the propriety of its withholdings under Exemptions 1, 3, and 6. Plaintiffs do not object to withholdings under any other exemptions. *See* Pls.' Opp'n at 32 n.1.

### i.  Exemption 1: National Security

Exemption 1 under § 552(b)(1) exempts from disclosure information that is both "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy[;] and (B) . . . properly classified pursuant to such

---

[22] "This justification typically takes the form of a *Vaughn* index, named for the case that introduced it." *El Badrawi*, 583 F. Supp. 2d at 310 (citing *Vaughn v. Rosen*, 484 F.2d 820, 820 (D.C. Cir. 1973)).

Executive order." 5 U.S.C. § 552(b)(1). "Stated differently, Exemption 1 applies to material that

has been properly classified." *Council on Am.-Islamic Relations*, 669 F. Supp. 3d at 88.

> For information to be properly classified for purposes of Exemption 1, it must satisfy the following requirements of section 1.1 of Executive Order 13,526, "Classified National Security Information": "(1) an original classification authority is classifying the information; (2) the information is owned by, produced by or for, or is under the control of the United States Government; (3) the information falls within one or more of the categories of information listed in section 1.4 of this order; and (4) the original classification authority determines that the unauthorized disclosure of the information could be expected to result in damage to the national security, . . . and the original classification authority is able to identify or describe the damage."

*Id.* (quoting 75 Fed. Reg. 707, 707 (Dec. 29, 2009)). Although an agency withholding documents

bears the burden of proving the applicability of the claimed exemptions, "[i]n the national security

context . . . [courts] must accord *substantial weight* to an agency's affidavit concerning the details

of the classified status of the disputed record." *ACLU*, 681 F.3d at 69 (emphasis in original)

(quotation omitted). In other words, courts should adopt a "deferential posture" to the agency's

assertions in FOIA cases, in light of the "uniquely executive purview of national security." *Larson*

*v. Dep't of State*, 565 F.3d 857, 865 (D.C. Cir. 2009) (quotation omitted); *see also Osen*, 969 F.3d

at 115 ("We have repeatedly found that it is appropriate to defer to executive declarations

predicting harm to the national security, and have found it unwise to undertake searching judicial

review." (quotation and alterations omitted)).

When analyzing an agency's withholding under Exemption 1, "[s]ummary judgment is

appropriate where the agency affidavits describe the justifications for nondisclosure with

reasonably specific detail, demonstrate that the information withheld logically falls within the

claimed exemption, and are not controverted by either contrary evidence in the record nor by

evidence of agency bad faith." *ACLU*, 681 F.3d at 69 (quotation omitted). To meet this burden,

"[l]ittle proof or explanation is required beyond a plausible assertion that information is properly classified." *Morley*, 508 F.3d at 1124.

Defendant redacted[23] records pursuant to Exemption 1 for four documents produced by DCPH-A and one document identified by CENTCOM and processed by NGA.[24] Def.'s SMF ¶¶ 44, 111. Rear Admiral Paul Spedero, Jr., U.S.N., Defendant's declarant, reviewed all the documents to which Exemption 1 redactions were applied. *Id.* ¶¶ 44, 112. Rear Adm. Spedero is the Vice Director of Operations, and in that capacity, he "assists in the execution of all DoD operational matters outside of the continental United States." *Id.* ¶ 45. As Vice Director of Operations, Rear Adm. Spedero receives and reviews operational plans, briefings, reports, and analyses regarding national security from the combatant commands, the Joint Chiefs of Staff, and the intelligence community. *Id.* ¶ 46. Rear Adm. Spedero also has an original classification authority ("OCA") of TOP SECRET and SECRET. Spedero Decl. ¶ 7.

Plaintiffs challenge the propriety of the redactions applied to both the NGA record and the DCPH-A documents. In the alternative, Plaintiffs request that the Court conduct *in camera* review of the withheld documents to determine whether national security concerns justify Defendant's withholdings. Pls.' Opp'n at 42. For the reasons stated below, the Court finds that Defendant properly applied redactions under Exemption 1 to these five documents. *In camera* review is not

---

[23] Defendant did not withhold any documents in full under Exemption 1. *See* Spedero Decl., ECF No. 42-9, ¶ 4.

[24] The NGA document to which Exemption 1 redactions were applied is titled "CVLC NGA Record." Spedero Decl. ¶ 4. Plaintiffs claim that this 11-page document "contains the unredacted information available" publicly in the McClatchy Article. *See* Pls.' Opp'n at 40–41; Browning Decl. ¶¶ 23–24. The DCPH-A documents to which Exemption 1 redactions were applied are titled as follows: "DOEH Health Site Assessment 2004_Redacted"; "Env Site Characterization 2001_Redacted"; "Environmental Assessment of Hardened Aircraft Shelters 2002 Redacted"; and "Preliminary IHA 15 Nov 2001_Redacted." Spedero Decl. ¶ 4; *see also* Exs. X to AA, Pls.' Opp'n, ECF Nos. 50-30 to 50-33.

necessary for the Court to make this determination because Defendant's affidavit is sufficient on its face. *See Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 76 (2d Cir. 2009).

### 1. NGA

In his declaration, Rear Adm. Spedero explains that NGA has two primary missions: (1) to "collect, process, analyze, produce, and disseminate geospatial intelligence ('GEOINT') information for foreign intelligence and counterintelligence purposes; and (2) to validate mapping, charting, and other navigator data. Spedero Decl. ¶ 8. To fulfill this mission, NGA collects information using a sophisticated network of technologies and sources, many of which are classified. *Id.* ¶ 9. The information that NGA collects is often distributed to the highest levels of the executive branch and is "relevant to a wide range of important issues including, but not limited to, military order of battle, threat warnings and readiness, arms proliferation, terrorism, and foreign aspects of international narcotics trafficking." *Id.* ¶ 10. Further, because "NGA's ability to produce GEOINT depends on its access to imagery," and because "GEOINT capabilities are both expensive and fragile," public disclosure of these capabilities would be particularly harmful to NGA's mission. *Id.* ¶ 11.

The bulk of the Exemption 1 redactions were applied to the NGA document. *See* Pls.' Opp'n at 41. Rear Adm. Spedero confirmed that the following categories of information are properly classified at the SECRET level: the association between individual NGA employees and specific national security or intelligence targets, Def.'s SMF ¶ 121; GEOINT imagery collected through National Technical Means sensors, *id.* ¶ 122; information derived from GEOINT imagery collected through National Technical Means sensors, in text or graphic form, *id.* ¶ 123; and the association between certain facilities and corresponding intelligence targets, *id.* ¶ 124. In its

memorandum of law, Defendant succinctly summarizes why, if this information were released, it would cause serious damage to U.S. national security:

> [I]t would either 1) enable individual NGA employees to be targeted by foreign intelligence services or adversaries, thus compromising or introducing unacceptable risk to the United States' geospatial intelligence enterprise; 2) reveal the United States' technical capabilities for collection of this imagery, thus enabling the United States' adversaries to exploit limitations in these capabilities and diminishing the strategic intelligence value of this collection means and associated methods; 3) reveal the capabilities of the United States' National Technical Means sensors or platforms, enabling adversaries to exploit possible limitations; or 4) facilitate the loss of the specific intelligence target or otherwise enable the adversary to change behavior with the effect of mitigating the ability of the United States to collect intelligence on the target.

Def.'s Mem. of Law at 36–37 (citing Def.'s SMF ¶¶ 121–24).

The Court is satisfied that Rear Adm. Spedero's affidavit adequately explains the reasons and justifications for the redactions to the NGA document under Exemption 1. Defendant identified what types of information were redacted with specificity, verified (with someone who had the requisite OCA) that the information was properly classified, and provided compelling and credible reasons for why the disclosure of this information would endanger national security—this is all that is required under the highly deferential standard of Exemption 1. *See Morley*, 508 F.3d at 1124. Further, there is no evidence in the record (and Plaintiffs have not provided any) of bad faith by Rear Adm. Spedero, nor any contrary evidence to the Rear Adm.'s sworn statements. *See ACLU*, 681 F.3d at 69.

Plaintiffs' arguments to the contrary are unpersuasive. First, they argue that the redactions to classified imagery—which protect the "quality, advantage, and limitations of such National Technical Means sensors and associated primary imagery records," Spedero Decl. ¶ 14—are unjustified because "[t]he platforms and techniques used by the NGA over two decades ago to collect images of K2 are not state-of-the-art today," and "many of the exoatmospheric observation

systems in place in 2001 and earlier, like satellites, may not even be operational any longer." Pls.' Opp'n at 42; *see also* Pls.' SMF ¶ 122. Plaintiffs' largely speculative assertions are not enough to cast doubt on Rear Adm. Spedero's declaration verifying that the information is properly classified. *See WP Co. LLC v. CIA*, No. 22-CV-1138 (RC), 2024 WL 983328, at *6 (D.D.C. Mar. 7, 2024) ("While it is true that the records the CIA has withheld are old, this Court is not in a position to second-guess an agency's classification decisions absent a contradiction on the record or evidence of bad faith." (quotation omitted)).

Next, Plaintiffs argue that—because the 11-page document produced by NGA allegedly "contains the unredacted information available" publicly in the McClatchy Article, Pls.' Opp'n at 40–41—Defendant has thus demonstrated "disinterest" in taking steps to remove the document from the public sphere, which amounts to "inadvertent" dissemination of the document. *Id.* at 40; Def.'s Reply, ECF No. 53, at 8. Plaintiffs provide no authority for this novel proposition that the government may not invoke Exemption 1 for classified documents that are inadvertently made public. The one case that Plaintiffs do cite, *Carlisle Tire & Rubber Co. v. U.S. Customs Service*, 663 F.2d 210 (D.C. Cir. 1980), is inapposite. In *Carlisle*, the district court held that the requester was entitled to classified information that had been purposefully disclosed, but not to information that had been inadvertently disclosed. The D.C. Circuit affirmed that decision. *Carlisle*, 663 F.2d at 21. Thus, Plaintiffs' claim that part of the NGA document may have been inadvertently leaked, and that Defendant has apparently not taken action to take down that document from the internet, is not sufficient to rebut Rear Adm. Spedero's declaration and reasons for redacting the document under Exemption 1.

The Court grants Defendant's Motion for Summary Judgment as to the propriety of the Exemption 1 redactions to the document produced by NGA.

### 2.  DCPH-A

DCPH-A applied redactions under Exemption 1 to four documents that it produced.  These documents were broadly "health and site assessments," which provided details about environmental tests conducted at K2.  Spedero Decl. ¶ 17.  Rear Adm. Spedero also reviewed these documents line-by-line and applied minimal redactions to three categories of information: "1) classified intelligence sources and procedures, 2) images of particular locations, or 3) references in endnotes that would reveal the sources of intelligence collection."  Spedero Decl. ¶¶ 18, 20.  The imagery was withheld for the same reason as the imagery in the NGA document was withheld—it would reveal the United States's technical capabilities for collecting that imagery, allowing potential adversaries to exploit the limits of those capabilities.  *See id.* ¶ 18; Def.'s SMF ¶¶ 122–23.  And the classified intelligence sources and procedures were redacted because revealing those sources would endanger those sources and allow potential adversaries to interfere with those sources.  Spedero Decl. ¶ 18.

The Court is also satisfied with Rear Adm. Spedero's explanation for redacting this information in the DCPH-A records under Exemption 1.  His declaration provides a compelling justification for redacting classified intelligence sources, and his assertions easily meet the Government's burden of providing an explanation that is both "plausible and logical."  *See ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 624 (D.C. Cir. 2011).  Further, Rear Adm. Spedero's experience with classified documents and sources provides his assertions with sufficient credibility, and there is no contrary evidence in the record to contradict his declaration.  Nor is there any evidence of bad faith in the record.  The only argument Plaintiffs muster against Rear Adm. Spedero's declaration is that he is "not a public or environmental health expert," and thus, he cannot properly assess what documents from DCPH-A are relevant to Plaintiffs' purposes or

34

not.  Pls.' Opp'n at 41.  Although plaintiffs are not required to explain their reasons for the request, *see Graff v. FBI*, 822 F. Supp. 2d 23, 33 (D.D.C. 2011), Rear Adm. Spedero's assessment of whether the redacted information would be "helpful" to Plaintiffs is beside the point because he successfully demonstrated that the redacted information was properly classified, and thus, fell within Exemption 1's purview.  And he does not need to have in-depth knowledge of environmental health or toxicology in order to determine whether information in a government document is properly classified or not.

Thus, the Court grants Defendant's Motion for Summary Judgment as to the propriety of the Exemption 1 redactions to the documents produced by DCPH-A.

### ii.  Exemption 3: Withheld Pursuant to Federal Statute

Exemption 3 under § 552(b)(3) exempts from disclosure matters that are "specifically exempted from disclosure by statute," as long as that statute fulfills certain requirements.[25] 5 U.S.C. § 552(b)(3).  Defendant redacted certain information under Exemption 3 pursuant to 10 U.S.C. § 130b, titled "Personnel in overseas, sensitive, or routinely deployable units: nondisclosure of personally identifying information."  Courts have routinely held that § 130b qualifies as an Exemption 3 statute, *see Wash. Post Co. v. Special Inspector Gen. for Afg. Reconstruction*, 486 F. Supp. 3d 141, 166 (D.D.C. 2020), and Plaintiffs do not dispute that § 130b qualifies as an Exemption 3 statute.  Pls.' Opp'n at 33–34.  Thus, because § 130b qualifies as an Exemption 3 withholding statute, "the only question is whether the withheld material falls within the statute."  *Hall v. CIA*, 881 F. Supp. 2d 38, 66 (D.D.C. 2012) (quotation omitted).

---

[25] Specifically, the Government may use Exemption 3 if the underlying statute "(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld."  5 U.S.C. § 552(b)(3)(A).

Section 130b provides that servicemembers' personally identifying information (PII) may be exempt from disclosure if they are a "member of the armed forces assigned to an overseas unit, a sensitive unit, or a routinely deployable unit."  10 U.S.C. § 130b(a).  "Personally identifying information" includes a person's "name, rank, duty address, and official title and information regarding the person's pay."  10 U.S.C. § 130b(c)(1).  Thus, the only question for the Court is whether Defendant has sufficiently demonstrated that the PII redacted under Exemption 3 belong to servicemembers who are "assigned to an overseas unit, a sensitive unit, or a routinely deployable unit."[26]  10 U.S.C. § 130b(a).

Defendant applied redactions pursuant to Exemption 3 to several records produced by DCPH-A, one document produced by CENTCOM, and one document produced by USASOC (through a referral from SOCOM).  DCPH-A, which provided a *Vaughn* index with all its redactions, *see* ECF No. 42-6, averred that it broadly applied Exemption 3 redactions to military members and DOD employees who were "either assigned to deployed units or routinely deployable units," including the 71st Medical Detachment, 172nd Medical Detachment, and the Coalition Forces Land Component Command.  Bonsall Decl. ¶ 37.  DCPH-A confirmed that these units have regular deployments to Afghanistan, Uzbekistan, and/or Kuwait.  *Id.*  Similarly, CENTCOM redacted two names on one document pursuant to Exemption 3 "because the two individuals were operations officers assigned to US Central Command," and they were "rotating in and out of the combat theater in Afghanistan."  Walburn Decl. ¶ 22.  CENTCOM also noted that the document at issue was created less than one year after 9/11, and thus, the risks to these

---

[26] The statute defines "overseas unit" as "a unit that is located outside the United States and its territories." 10 U.S.C. § 130b(c)(3).  It defines "sensitive unit" as "a unit that is primarily involved in training for the conduct of, or conducting, special activities or classified missions."  10 U.S.C. § 130b(c)(4).  And it defines "routinely deployable unit" as "a unit that normally deploys from its permanent home station on a periodic or rotating basis to meet peacetime operational requirements that, or to participate in scheduled training exercises that, routinely require deployments outside the United States and its territories."  10 U.S.C. § 130b(c)(5).

individuals, in particular, is high. *Id.* Lastly, USASOC redacted two names pursuant to Exemption 3 on the one-page document that it produced (pursuant to a referral from SOCOM). Nesbitt Decl., ECF No. 42-11, ¶ 6. These two names belonged to individuals who were "assigned to USASOC" in the early 2000s, and they were a part of a routinely deployable unit. *Id.* ¶ 8.

The representations in these declarations are all facially sufficient for the Court to determine that the Exemption 3 redactions were proper. Although Plaintiffs rely on *O'Keefe v. U.S. Department of Defense*, 463 F. Supp. 2d 317 (E.D.N.Y. 2006), for the argument that these declarations are insufficient, in *O'Keefe*, the government's affidavits only stated, in a conclusory manner, that "these individuals fall within 10 U.S.C. § 130b(a)." 463 F. Supp. 2d at 325 (cleaned up) (citing record). Defendant has provided substantially more here, indicating specific units where these individuals were deployed and specific countries to which they were deployed. As such, the Court's inquiry is at an end because Defendant has met its burden, and there is no contradictory evidence in the record. *See Connell v. U.S. S. Command*, No. 18-CV-1813 (RDM), 2020 WL 6287467, at *3 (D.D.C. Oct. 27, 2020).

Notwithstanding, Plaintiffs challenge the Exemption 3 redactions on the theory that Defendant has not shown that these servicemembers are *presently* part of qualifying units under § 130b, as they argue is required by the statute. Pls.' Opp'n at 34. However, as Defendant notes, the only case that Plaintiffs cite for this proposition is an unreported District of Alaska case, *Windel v. United States*, No. A02-CV-306 (JWS), 2005 WL 846206 (D. Alaska Apr. 11, 2005), and the court in that decision does not provide any statutory interpretation analysis to support its conclusion.[27] *See id.* at *2; Def.'s Reply at 7 n.10. And in the absence of any other compelling

---

[27] Indeed, the sentence in *Windell* that Plaintiffs cite to is *dicta*, as the court was not determining whether former members of routinely deployable units would be covered by the statute. Rather, the court needed to decide whether it was a requirement for the covered servicemembers to have been in a qualifying unit *when the record was*

justification, or "factual basis to believe that the names of these individuals were improperly redacted," Defendant has met its burden, and these names are properly withheld under Exemption 3. *See Connell*, 2020 WL 6287467, at \*3.

Accordingly, the Court grants Defendant's Motion for Summary Judgment as to the propriety of the redactions made to DCPH-A, CENTCOM, and USASOC records pursuant to Exemption 3.

### iii.  Exemption 6: Personal Privacy

Exemption 6 under § 552(b)(6) exempts "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  In analyzing a redaction under Exemption 6, the court must first determine whether the information to be redacted is found in a "personnel, medical, or similar files" (broadly defined as "detailed Government records on an individual which can be identified as applying to that individual").[28] *Cook v. Nat'l Archives & Recs. Admin.*, 758 F.3d 168, 174 (2d Cir. 2014) (internal quotations omitted).  If the information is from a covered source, the court must balance the public's interest in obtaining the requested information against the individual's privacy interest to assess whether disclosure would constitute a "clearly unwarranted invasion" as envisioned by the statute.  *Assoc. Press v. U.S. Dep't of Def.*, 554 F.3d 274, 291 (2d Cir. 2009).  And "[w]hether the public interest in disclosure warrants the invasion of personal privacy is determined by the degree to which disclosure would further the core purpose of FOIA, which focuses on 'the citizens' right to be

---

*created*.  *Windell*, 2005 WL 846206, at \*2.  The *Windell* court determined that that was not a requirement under § 130b.

[28] Plaintiffs do not dispute that the documents to which Defendant applied these redactions are "covered sources" under Exemption 6 of FOIA.

informed about what their government is up to.'" *Id.* at 285 (quoting *U.S. Dep't of State v. Ray*, 502 U.S. 164, 177 (1991)).

Defendant applied redactions pursuant to Exemption 6 for numerous records produced by DCPH-A, CENTCOM, and USASOC (pursuant to a referral from SOCOM). Defendant avers that these redactions were categorically applied to documents involving "investigative occupational and environmental health information collected by medical personnel," Def.'s Mem. of Law at 27, with the "names, signatures, contact information, or a combination thereof, of military members and DoD employees who are at the military rank of O-6 or below and at the rank of GS-15 or below." Bonsall Decl. ¶ 36 (for documents produced by DCPH-A); *see also* Walburn Decl. ¶ 18 (noting that two names and one physical signature were redacted under Exemption 6 on records produced by CENTCOM); Nesbitt Decl. ¶ 9 (noting that two names of individuals with "the rank of Colonel or below" were redacted under Exemption 6 on the one-page record produced by USASOC). Defendant also apparently applied redactions to the ranks and titles of these DOD employees and military members, to the extent they appeared in the documents. *See* Pls.' Opp'n at 38–39; Def.'s Reply at 7–8. Plaintiffs challenge these redactions, arguing that the disclosure of the names and, at the very least, the ranks of these low-level officials would benefit the public interest which sufficiently outweighs the minimal privacy interests. The Court agrees with the Plaintiffs that both the ranks and names of these officials are not protected by Exemption 6 and must be disclosed, while their other PII (including signatures and contact information) are properly protected by Exemption 6.[29]

---

[29] Plaintiffs do not dispute that DOD officials' signatures and contact information (such as their personal addresses and phone numbers) are properly redacted under Exemption 6.

### 1. Withholdings of Ranks of DOD Personnel

Plaintiffs first argue that Defendant improperly withheld the ranks, titles, and other qualifications of low-level DOD officials in documents produced by DCPH-A, CENTCOM, and USASOC. As Plaintiffs correctly point out, FOIA's presumption in favor of disclosure is "at its zenith under Exemption 6." *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 37 (D.C. Cir. 2002); *see* Pls.' Opp'n at 36. And "[a]n invasion of more than a *de minimis* privacy interest protected by Exemption 6 must be shown to be 'clearly unwarranted' in order to prevail over the public interest in disclosure." *Assoc. Press*, 554 F.3d at 291 (quotation omitted).

Defendant has not met its burden to show that the privacy interest in the ranks of these low-level individuals outweighs the public interest in disclosure. Defendant does not claim that the disclosure of these ranks could reveal these officials' identities, which could at least conceivably implicate a privacy interest protected by Exemption 6. *See Mountgordon v. U.S. Coast Guard*, 691 F. Supp. 3d 72, 90 (D.D.C. 2023) ("Why not include the ranks of the witnesses with whom Captain James spoke, for example? It might be the case that there are so few potential holders of a given rank that a knowledgeable member of the public could infer who the witness was from her or his rank. But, if so, the declarant needs to offer some explanation.").

On the other hand, Plaintiffs argue that having the ranks (in isolation) of the officials who prepared these reports is very valuable to their constituents and to the public: "the ranks of officials reviewing and generating official documents regarding K2 are highly correlative to the adequacy of procedures followed and investigations undertaken to ensure servicemember safety," and furthermore, that the ranks of these officials "bear on their technical qualifications to assess environmental safety conditions at K2." Pls.' Opp'n at 40. Under Exemption 6, a disclosure is in the public interest when it "she[ds] light on an agency's performance of its statutory duties or

40

otherwise let[s] citizens know what their government is up to." *O'Keefe*, 463 F. Supp. 2d at 326. The Court agrees that disclosure of these ranks could shed light on the agencies' performance in assessing the conditions at K2 and thus fall squarely within public interest purposes of FOIA. And even if the Court accepts that there is some minimal interest in privacy in these ranks, the public interest in disclosure outweighs any such interest. "Exemption 6 does not protect against disclosure every incidental invasion of privacy—only such disclosures as constitute 'clearly unwarranted' invasions of personal privacy." *Rose*, 425 U.S. at 382.

Accordingly, Defendant is not entitled to summary judgment on these Exemption 6 withholdings. Defendant must disclose the redacted ranks, titles, and other non-identifying qualifications in documents produced by DCPH-A, CENTCOM, and USASOC.

### 2. Withholdings of Names of Personnel

Plaintiffs also argue that Defendant improperly withheld the names of these low-level DOD officials. Plaintiffs first challenge the categorical application of Defendant's assertion of Exemption 6, arguing that courts have disfavored this approach and that Defendant must conduct an individualized assessment of these low-level officials. *See* Pls.' Opp'n at 37. "A categorical approach to redactions or withholdings is permissible under FOIA when the FOIA litigation process threatens to reveal the very information the agency hopes to protect." *Prison Legal News v. Samuels*, 787 F.3d 1142, 1149 (D.C. Cir. 2015) (quotation omitted). However, if the government wishes to justify its redactions categorically, "its definitions of relevant categories [must be] sufficiently distinct to allow a court to determine whether specific claimed exemptions are properly applied." *Id.* at 1150 (quotation omitted). In other words, there must be a "sufficient showing that the balancing analysis under Exemption 6 would yield a uniform answer across the entire proffered category, regardless of any variation among the individual records or persons

41

falling within it." *Am. Immigr. Laws. Ass'n v. Exec. Off. for Immigr. Rev.*, 830 F.3d 667, 675 (D.C. Cir. 2016).

Defendant justifies the categorical redactions of the names of all DOD personnel ranked O-6 or below, or GS-15 or below: DCPH-A's affidavit states that the agency "has a practice to withhold" this personally identifying information because disclosing the names of the individuals involved "could subject such individuals to annoyance or harassment in their private lives," which implicates a "significant personal privacy interest." Bonsall Decl. ¶¶ 36, 38. USASOC's affidavit offers the same justification. Nesbitt Decl. ¶ 9. This affidavit also includes that there were two specific names redacted who were either "at the military rank of Colonel or below and at the rank of GS-15 or below," and that USASOC's exception to this policy—to allow "the names of those personnel who routinely deal with the press"—did not apply. *Id.* Both affidavits cite to *O'Keefe v. U.S. Department of Defense*, 463 F. Supp. 2d 317 (E.D.N.Y. 2006), a decision in which the court determined that the "probative value of the [identities of low-ranking DOD officials] is nominal and does not overcome the privacy interest of the employees involved." 463 F. Supp. 2d at 327.

If the reasons proffered are sufficient, it appears that "the balancing analysis under Exemption 6 would yield a uniform answer across the entire proffered category." *Am. Immigr. Laws. Ass'n*, 830 F.3d at 675. That is, if disclosure could result in harassment or annoyance in the individuals' private lives, this would appear to be true regardless of their rank or GS classification. The question then is whether the proffered justification is sufficient to invoke Exemption 6.

With regards to the public interest, Plaintiffs repeat their argument as to the ranks of the officials, stating that the names of officials would bear on the technical qualifications of the people who investigated the environmental conditions at K2, and thus, on the adequacy of the procedures

42

followed at K2. *See* Pls.' Opp'n at 38; Def.'s Reply at 7–8.[30]  This latter purpose implicates precisely the justification for the redactions in the first instance.

The public's interest in who was involved in the decision-making, or even information gathering, regarding K2, outweighs the *possible* intrusion into the private lives of the individuals which might be occasioned by disclosure of their names.  And while some individuals might be contacted, there is little basis to conclude that such contact would be harassing or annoying.  Accordingly, Defendant is not entitled to summary judgment on these Exemption 6 withholdings.  Defendant must disclose the redacted names under Exemption 6 in documents produced by DCPH-A, CENTCOM, and USASOC.

## IV.    Conclusion

For all these reasons, Defendant's Motion for Summary Judgment (ECF No. 42) is GRANTED in part and DENIED in part.  Defendant's Motion is GRANTED as to: all withholdings under Exemption 1, all withholdings under Exemption 3, and the withholdings under Exemption 6 as to officials' signatures and contact information.  Defendant's Motion is DENIED as to: the adequacy of DCPH-A's, CENTCOM's, SOCOM's, and OSD's searches, and the withholdings of names and ranks of officials under Exemption 6.

Plaintiffs' Cross-Motion under Rule 56(d) is GRANTED in part.  Plaintiffs will be permitted limited discovery as to the adequacy of Defendant's searches, as explained herein.

**SO ORDERED** at Bridgeport, Connecticut, this 2nd day of April, 2026.

 */s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE

---

[30] Defendant also accuses Plaintiffs of wanting the names of these officials to "pursue, and cast aspersions on, the individuals," Def.'s Reply at 7, which could also arguably speak to the privacy interest asserted by Defendant.